## CHARLESTON.

### STATE *v.* HOBBS.

Submitted January 26, 1893.—Decided April 1, 1893.

1. HOMICIDE.

　　The first clause of section 1, c. 144, Code, is as follows: "Murder by poison, lying in wait, imprisonment, starving, or any willful, deliberate, and premeditated killing or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree."

2. HOMICIDE—BURDEN OF PROOF—CRIMINAL PRACTICE.

　　Where a homicide is proved, the presumption is that it is murder of the second degree; and the burden is on the State of showing, if it can, that it is murder of the first degree, and upon the accused, of showing, if he can, that it was without malice and is therefore only manslaughter, or that he acted lawfully and therefore is not guilty.

3. HOMICIDE—INDICTMENT—VENUE—CRIMINAL PRACTICE.

　　That the alleged crime was committed within the jurisdiction of the court must be shown in the indictment, and proved as charged.

4. HOMICIDE—EVIDENCE—CRIMINAL PRACTICE.

　　But it is not necessary that the proof should be direct that the

crime was committed in the county charged. It is enough if the proof be inferential, but sufficient.

5. HOMICIDE—EVIDENCE—CRIMINAL PRACTICE.

No statement made by one accused of murder, while a witness testifying at the coroner's inquest, can be used against him on his trial; but anything said by him before such examination as a witness is competent, if relevant.

6. NEW TRIAL—CRIMINAL PRACTICE.

A new trial will not be granted in a criminal case for matter that is a principal cause of challenge to a juror, which existed before he was elected and sworn as such juror, but which was unknown to the prisoner until after the verdict, and which could not have been discovered by the exercise of ordinary diligence, unless it appears from the whole evidence submitted to the court upon such motion (not from the evidence before the jury) that the prisoner suffered injustice from the fact that the juror served in the case.

7. INSTRUCTIONS—CRIMINAL PRACTICE.

A case in which certain instructions given on behalf of the State are held to be correct, and No. 7, asked on behalf of the prisoner, properly refused.

C. T. CALDWELL and J. F. BARROW for plaintiff in error cited 23 W. Va. 426; 8 W. Va. 743; Whar. Cr. Law § 1027; 93 U. S. 465; Code 946, s. 20; 31 W. Va. 507; 33 W. Va. 424; 1 W. Va. 336; 33 W. Va. 455.

Attorney General ALFRED CALDWELL for the State:

I.—*Bill of exceptions.*—Code, c. 131 s. 9, *et seq.; Id.* c. 160, s. 1; Acts 1891, c. 100.

II.— *Venue*—*Coronor.*—Const. Art. IX, s. 2; Code, c. 154, s. 1, *et seq.;* 33 W. Va. 455; 1 W. Va. 336; 23 W. Va. 813; Whar. Cr. Ev. (9th Ed.) §§ 107, *et seq.*

III.—*Objections relating to juror.*—33 W. Va. 324.

IV.—*Indictment.*—24 W. Va. 767.

HOLT, JUDGE:

In the Circuit Court of Pleasants county on the 15th day of March, 1892, the grand jury of the county found and returned, indorsed "A true bill," an indictment against the prisoner, E. N. Hobbs, charging that the prisoner on the 31st day of October, 1891, in the said county of Pleasants, murdered one Henry Beaver. The prisoner moved to quash the indictment. It is in the form given by statute as suffi-

cient, and the motion was properly overruled. The prisoner then pleaded not guilty. The issue was tried by the jury, who found Hobbs not guilty of murder in the first degree, but found him guilty of murder in the second degree; and the court fixed the term of confinement in the penitentiary at five years.

The prisoner took exceptions to various rulings of the court during the trial, and also to the ruling of the court overruling his motion to set aside the verdict and grant him a new trial, and has brought the case here by writ of error.

One of the grounds of error relied on is that there was no evidence proving, or fairly tending to prove, that the offence was committed in the county of Pleasants. "It seems agreed by all the books that no indictment can be good without expressly showing some place wherein the offence was committed, which must appear to have been within the jurisdiction of the court in which the indictment is taken." 2 Hawk. P. C. c. 25, § 83; 3 Greenl. Ev. § 143. And it is also necessary to prove that it was done in the county, where the indictment is found, and the trial had; and "it is error for a Circuit Court to refuse to set aside the verdict of a jury, and grant a new trial, where a party is convicted (of larceny) when no evidence is produced at the trial showing the offence to have been committed within the jurisdiction of the court hearing the case." *Hoover's Case,* 1 W. Va. 336.

That the alleged crime was committed within the jurisdiction of the court was a material fact, in order to convict, and should have been proved as charged; and, when the State fails to make such proof, it is error for the Circuit Court to refuse to set aside the verdict and grant a new trial in a felony case. *Mills' Case,* 33 W. Va. 455, 456 (10 S. E. Rep. 808).

Section 12, c. 152, of the Code, provides: "An offence committed on the boundary of two counties, or within one hundred yards thereof, may be alleged to have been committed, and may be prosecuted and punished, in either county."

This has been held to be unconstitutional, because, by our present constitution (article III, § 14) the venue in all

criminal cases is the "county" where the alleged offence was committed. *Lowe's Case*, 21 W. Va. 782–790. To this alleged want of proof upon this vital point the State makes two answers:

1. That there is no valid bill of exceptions in the record, and for that reason the judgment of the court below should be affirmed; and they are claimed to be invalid for the following reasons: By section 9 of chapter 131 of the Code, as amended by the act of 1891, "the court may in vacation within thirty days after the adjournment of the term make up and sign any bills of exception and certify the same to the clerk of the court, who shall enter it upon the order-book of such court; and any such exceptions so made in vacation shall be a part of the record and have the same effect as if made in term-time." This is found in a chapter relating to civil trials and proceedings and does not and never was intended to embrace criminal cases, which are provided for by section 1 of chapter 160, which relates solely to criminal proceedings. Section 1, c. 160, reads as follows:

"A party in a criminal case or proceeding for contempt, for whom a writ of error lies to a higher court, may except to an opinion of the court and tender a bill of exceptions, which, if the truth of the case be fairly stated therein, the judge shall sign, and it shall be a part of the record."

If this should be the true construction of this amendment of section 9 of chapter 131, and that the judge had no power in criminal cases to make up and sign and certify a bill of exceptions, then there would be strong reason for holding such delay as serious error to the prejudice of the prisoner. But I regard the construction, which the Circuit Court acted upon, as the correct one, and I think such is the construction, which has so far been given it, by the bench and bar. At any rate, the need of it was fully as urgent and apparent in protracted criminal trials as in civil trials, and the law-maker no doubt supposed it applied to both classes of cases. The language is certainly broad enough to cover both. "In the trial of a case at law, in which a writ of error or *supersedeas* lies to the court of appeals, * * * the court shall certify all the evidence,

\* \* \* and the whole of the evidence so certified shall be considered by the court of appeals." And when we come down to the clause in question, it says, "and any such exceptions so made in vacation," etc.

As to the place in which we find it, the whole Code is expressly made "one act" in the beginning (see Code 1891, p. 53); and although the immediate context, treating chapter 131 as such context, relates, for the most part, to civil matters alone, yet it is not confined to such matters. The first section of chapter 131 provides for making out a docket " of cases of the State," and the clerk "shall, under the control of the court, set the cases to certain days." That the two sections cover, to some extent, the same subject-matter, viz : the taking of bills of exceptions, is not of itself sufficient to restrain the provision in question to civil proceedings; for such overlapping of different statutes is not uncommon—at least, it is not sufficient to make the amendment in question inapplicable to criminal trials, when it appears, as it does in this case, that such trials are within both the reason and the letter of the act in question.

2. The second answer made by the State is, that, although there was no direct evidence that the house where the homicide took place was in Pleasants county, yet the jury was authorized to infer that the crime was committed in such county because W. E. Reed, the coroner of Pleasants county, held an inquest over the dead body of Beaver at the house of the prisoner, Hobbs, where the homicide took place.

"It is not necessary that witnesses should be produced to testify that the offence was committed in the place charged. It is enough if the proof be inferential." Whart. Crim. Ev. (8th Ed.) § 108, and cases ; State v. *Poindexter*, 23 W. Va. 805 ; *Spencer's Case,* 2 Leigh, 751 ; 3 Greenl. Ev. § 112; *Com.* v. *Costley,* 118 Mass. 3.

Section 1, c. 154, provides, among other things, as follows : "It shall be the duty of the County Court of every county, from time to time, to appoint a coroner for such county, who shall hold the office during the pleasure of the court, and shall take the oath of office prescribed for other county officers. It shall be his duty, or if he be absent, or

unable to act, or the office be vacant, the duty of any justice of the peace, upon being notified that the dead body of a person, whose death there is good cause to believe has been caused by some unlawful act, and not by casualty, is within his county, to forthwith issue his warrant," * * * "to summon six suitable residents of the county to make inquisition upon view of the body," *etc.*

The prisoner, in his evidence, speaking of what occurred after the homicide, says: "As soon as Riggs came, and he examined him (Beaver, the deceased) we sent for Mr. L. Barron, justice, to come and hold an inquest. I didn't know anything about a coroner at St. Mary's. (Pleasant courthouse.) I didn't know there was a county-coroner." He had already testified that he had in self-defence shot Beaver at his (Hobbs') dwelling house and that Beaver's dead body was then lying in his kitchen.

The witness for the defence, E. R. Riggs, testified as follows: "When my son and I got to the house (Hobbs') and found the man (Beaver) dead, Mr. Hobbs wanted a coroner. We didn't know anything about the county having a coroner, so we sent for Mr. L. Barron, justice of the peace. My boy went after him and he came."

It is also shown that W. E. Reed, the coroner of Pleasants county, was notified that there was the dead body of a man "within the county," viz: the. dead body of Henry Beaver, at the house of the prisoner, E. N. Hobbs, who also attended with a jury, and held the inquest, and he had no power to act in any other county.. The jury could fairly infer that, when the prisoner and the witness Riggs spoke of the county having a coroner, they meant the coroner of the county where the prisoner, Hobbs, lived. They both recognized W. E. Reed as the proper one to act when they ascertained the county had a coroner, and that Reed was such coroner; and he proves that he lived at St. Mary's, the county seat; was the coroner of Pleasants county; was notified of the homicide while he was at church on Sunday morning, November 1, 1891; at once repaired to the house of the prisoner, where it is fair to infer he found "within his county" the dead body of Henry Beaver, where alone he could lawfully hold an in-

quest. Putting these facts together, the jury were author-
ized to infer from them that the house of Hobbs was situ-
ated in the county of Pleasants.

PRISONER'S BILL OF EXCEPTIONS.

No. 1. Witness J. B. Watson, M. D., made the *post
mortem* examination of the body of the deceased, and said
he cut the ball out, which had lodged in the backbone. He
was shown the bullet and identified it and it was then
offered in evidence. To this the prisoner excepted, but the
court permitted it to be put in evidence, and in this there
was no error.

Bills of exception Nos. 2, 3, 4, 5, 6, and 7 all relate to
questions asked Coroner Reed by the State. These excep-
tions were based on section 20, c. 152, which reads as
follows: "In a criminal prosecution, other than for
perjury, evidence shall not be given against the accused of
any statement made by him as a witnes upon legal exami-
nation." The prisoner, Hobbs, showed the coroner where
he stood in his kitchen when he shot Beaver. Coroner
Reed was not sure whether this was done by Hobbs before
he was sworn as a witness at the inquest, or after. The
witness stated: "I didn't swear any witnesses until after we
viewed the body, and we had Hobbs present when we
viewed the body."

The court ruled that what Hobbs said to the coroner
and jury before he was sworn was competent evidence, and
permitted him to answer, after making the remark,
"Hobbs showed me where he stood when he did the shoot-
ing." Hobbs himself, in his evidence on the trial, described
and explained the place where he stood, showing that,
when Beaver came at him with the butcher knife, the
prisoner could not get out of the kitchen, because Beaver
was between him and the door. There was no error in
the various rulings of the court on this point, certainly
none to the prejudice of the prisoner.

BILL OF EXCEPTION No. 8.

Mrs. Carrie Stewart was introduced as a witness on be-
half of the prisoner, who propounded to her the following
question: "What do you know, if anything about Beaver
coming to your house on Thursday before the day of his

death, during Mr. Hobbs' absence, and wanting a revolver?
And what did he say he wanted it for ?" The state object-
ed, the court sustained the objection, and the prisoner ex-
cepted. This question was perhaps objectionable, as lead-
ing and suggestive, and taking for granted things not ap-
pearing or proved. But there was nothing offered to show
—nothing said or promised by counsel to make it relevant.
It is not claimed that there was any threat made against
the prisoner. On the subject of good feeling between them,
Hobbs' evidence is : "He (Beaver) and I had never had
any trouble before that (the time of the killing ;) and in fact
I didn't suppose he was mad at me until he came at me
with the butcher knife, swearing what he would do, and
struck at me." "We had had no quarrel, trouble, dispute,
or disagreement before this difficulty." · The court com-
mitted no error in refusing to permit the question to be
answered.

The court, on motion of the State, gave the following
three instructions to the jury, to the giving of which the
prisoner excepted, and on motion of the prisoner gave the
following six instructions, but refused to give the prisoner's
seventh instruction, and he excepted.

### Instruction No. 1 for the State.

"The jury are instructed that if the jury believe from the
evidence that Henry Beaver came to his death from a pistol
shot wound at the hands of E. N. Hobbs and the defendant
relies upon self defence to excuse him for the use of the
weapon, the burden of proof is on him to show it by a pre-
ponderance of the evidence.

### Instruction No. 2.

"The jury are instructed That if the jury believe from
the evidence that Henry Beaver came to his death by a pis-
tol shot wound at the hands of E. N. Hobbs, the presump-
tion is that it is murder in the second degree. If the State
would elevate it to murder in the first degree, she must es-
tablish the characteristics of that crime; and if the prisoner
would reduce it to manslaughter, the burden of proof rests
upon the prisoner.

### Instruction No. 3.

"The jury are instructed that a man is presumed to intend

that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner, with a deadly weapon *in* his possession without any or upon very slight provocation, gives to another a mortal wound, the prisoner is *prima facie* guilty of willful, deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the state, he is guilty of murder in the first degree."

### INSTRUCTION No. 1 FOR DEFENDANT.

"The jury are instructed that the defendant is by law presumed to be innocent, and it is the duty of the state to prove him guilty, as charged in the indictment, beyond all reasonable doubt; and, if the state fails to prove every material allegation in the indictment, then the jury must find him not guilty."

### INSTRUCTION No. 2.

"The jury are instructed that when one, without fault himself, is attacked by another in such a manner, or in such circumstances, as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there are reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable grounds to believe, and does believe, such danger is imminent, he may act upon such appearance, and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing, under such circumstances, is excusable, although it may afterwards turn out that the appearances were false, and that there was in fact neither design to do him some serious injury, nor danger that it would be done. But of this the jury must judge, from all the evidence and circumstances in the case."

### INSTRUCTION No. 3.

"The jury are instructed that a man's house is sacred, and his own castle, to himself and family, and that if attacked in his own house by a person armed with a butcher

knife, or other dangerous weapon, and he has reason to believe, and does believe, he is in danger of losing his life, or in danger of suffering great bodily harm, at the hands of his assailant, he is not required to retreat, but may defend his life or person by taking the life of his assailant without retreating."

## INSTRUCTION No. 4.

"The jury are instructed that if they are satisfied from the evidence that Henry Beaver, armed with a butcher knife, attacked the defendant, and that the defendant had reasonable cause to believe and fear, and that he did believe and fear, that great bodily harm was about to be inflicted on him, and that, under the influence of such belief and fear, he fired the said shot with intent to defend o. protect himself, then he is not guilty."

## INSTRUCTION No. 5.

"The jury are instructed that, after considering all the evidence in the case, if they have any reasonable doubt of the guilt or innocence of the defendant, they must give the defendant the benefit of such doubt, and acquit him."

## INSTRUCTION No. 6.

"The jury are instructed that the defendant, Hobbs, stands indicted, and is on trial, for killing Henry Beaver, and not for any other offence; and the jury can not, in determining the guilt or innocence of Hobbs, consider any charge of adultery, or selling whisky, nor any other offence. But his guilt or innocence, as charged in said indictment, is the only offence of which the jury can inquire, on this trial."

## INSTRUCTION No. 7. REFUSED BY THE COURT.

"The jury are instructed that the defendant, Hobbs, is a competent witness in this case, and that he is competent to testify to the state of his feelings toward the deceased, Henry Beaver, at the time the fatal shot was fired; his evidence to be given such weight as the jury may think it worth."

The killing of Beaver by the prisoner, Hobbs, took place in the evening of the 31st day of October, 1891, in the kitchen of Hobbs' dwelling-house. So far as appears, there was no one in the house at the time but those two persons, and no third person saw it. There was evi-

dence tending to show that the deceased, Henry Beaver, was an excitable, and, when angry, a very dangerous, man —using, when fighting, any weapon or thing which came to hand, or "came in his way"—and had been engaged in other serious personal difficulties; also, tending to show that both men were drinking some at the time.

Then comes the evidence of the prisoner himself, the substance of which is that it was a case of self-defence. He says, in short, in addition to what has already been quoted, that he had arranged to kill at his house a large hog—a very large one; and being sixty four years old, crippled up, and not well, he went to the mills near by for help, where he met Henry Beaver, who consented to go home with him, and assist him. They killed the hog; carried it into the kitchen. Obadiah Fetty, who was helping, went home. About the time Beaver finished cutting up the hog, he and the prisoner got into a quarrel, and prisoner called him a liar. Soon after, Beaver followed him from the sitting room into the kitchen swearing he would kill him. Beaver then got the butcher knife used in cutting up the hog, made at prisoner with it, and struck at him. Prisoner knocked off the lick. Beaver drew up again to cut him with the knife, and prisoner jerked out the pistol and fired. The ball passed into Beaver's breast, through his body, and lodged in his backbone, causing death. They were close together. The pistol touched Beaver when prisoner fired. Prisoner could not get out of the kitchen. He tried the bedroom door. It was locked. He could not get back into the sitting room, for Beaver was near that door, nor could he get out at the kitchen door, for it was at the other end. Prisoner had never had any trouble before that with Beaver—no quarrel, dispute, or disagreement. That he was greatly excited—it was all done in a moment—and that he was compelled to shoot, or be killed himself, in his own house.

This is the substance of the prisoner's testimony— enough to show the relevancy of the instructions given and refused. The three instructions given for the State lay down the law correctly, as shown by the case of *State* v. *Cain*, 20 W. Va. 679.

The State's instruction No. 1 is criticised because the term "preponderance of evidence" is used. This is a common term in treating of evidence, and was used, no doubt, to avoid misapprehension, and distinguish it from "evidence proving guilt beyond reasonable doubt," as used in instruction No. 1 given for the prisoner. It was, no doubt, understood, conveyed the idea intended in this particular case correctly, and could not have confused or misled the jury.

The State's instruction No. 2 is objected to, and the matter of objection now pointed out for the first time is to the term "characteristics of that crime" (murder in the first degree) and that the court did not tell the jury what are the characteristics of murder in the first degree. But there can be nothing in this objection; for it is followed by instruction for State, No. 3, in which the court, with direct reference to the case on trial, does give correctly the essential characteristics of murder in the first degree, as given in the statute. See section 1, c. 144, Code.

The six instructions given for the prisoner seem to cover all phases of the case which the evidence in any wise tended to prove, so far as the defence was concerned.

Was it error to refuse to give the prisoner's instruction No. 7? In refusing instruction No. 7, the learned judge who presided at the trial certified that no question was raised or argued before the court or jury as to the competency of defendant Hobbs as a witness, or to give evidence in the case; that the court allowed him to testify as to his feelings toward the deceased, Henry Beaver, at the time the fatal shot was fired, and he did so testify. His evidence was allowed to go to the jury, just in the same way that the evidence of the other witnesses was allowed to go, without any question or prejudice whatever. The instruction was not read or discussed in the presence of the jury, nor did the court comment on it in their presence, and they were not aware that such instruction was asked and refused; so that there could have been no prejudice in the minds of the jury from the fact of the refusal to give the instruction. The competency of the prisoner as a witness in his own behalf was a question of practice during the progress of the trial, and

had been already ruled in his favor without question or objection.

Why the court should, under the circumstances, expressly and formally instruct the jury that such express or implied ruling during the trial, that the witness was competent, was a correct ruling, I am unable to see. In nearly every one of the nine instructions given by the court to the jury, they are, by plain implication, told to weigh and consider all the evidence before them; and four of the instructions given on behalf of the prisoner are based expressly upon the hypothesis which the prisoner's testimony tended to prove, comprehending the facts of his belief and his fears; and in No. 2 they are expressly told that they (the jury) must judge of the hypothetical facts named in the instruction from all the evidence and circumstances in the case. I do not think the prisoner was entitled, under the circumstances of this case, to have his competency as a witness thus emphasized and specially dwelt on, and there was no error in refusing to give such instruction.

The prisoner also based his motion for a new trial on newly-discovered evidence, and read in support thereof the affidavit of Mrs. Martha Bailey. This affidavit only gives particular declarations made to her by the deceased; that he bragged of his manhood, said he had cleaned out five men, cut the sixth one with a knife, and showed her the size of the knife. Such evidence of particular facts would not be admissible, if produced to show the reputation of the deceased as a dangerous and violent man. His reputation as such was already shown by many witnesses; and, even if such evidence of particular facts was admissible, it would only be cumulative and corroborative evidence upon a collateral point, and not such as ought to produce on another trial an opposite result, on the merits. *Thompson's Case*, 8 Gratt. 637; *Brown v. Speyers*, 20 Gratt. 296; *Betsall's Case*, 11 W. Va. 703; 16 Am. & Eng. Enc. Law, 564, and cases cited; Hill, New Trials (2d Ed.) 492. She also states in her affidavit that Beaver said, that the people of this county called Mr. Hobbs a good man, but if he ever came in contact with Hobbs, he (Beaver) would get the drop on Hobbs, *etc.* This does not even amount to a threat. It was said in the spring and summer of 1891.

The sixth ground of error assigned is that the court erred in not granting a new trial on the ground of the prejudice of the juror Bailey as shown by affidavit. An affidavit is filed, showing that the juror O. S. Bailey was present at the inquest, heard the evidence, saw the physician dissect the body, and hauled the body with his team to the burying grounds; also, four several affidavits.

The affidavit of Allie Stewart states "that said Bailey, in speaking of the killing of Beaver, said that Hobbs had no right to shoot Beaver; that Hobbs was a large man, and a scienced man, and could have knocked Beaver down, if he (Beaver) did have a butcher knife." Bailey makes affidavit that this statement is false and untrue in every particular.

Another affidavit states the following as having occurred between Bailey and affiant: "Well, Bailey, you fellows (meaning the jury) did it up just as you said last winter;" and Juror Bailey replied, "Yes," and that he had said before that last winter that Hobbs ought to go to the penitentiary."

Another affidavit that Bailey said to affiant, in reference to the killing of Henry Beaver, "Hobbs ought to serve a couple of years in the penitentiary."

Another affiant makes affidavit that Bailey said that, if he were on the jury, he would do all he could to send Hobbs to the penitentiary, "for that is the place he ought to be."

On the other side, the affidavit of this juror is filed, in which he flatly contradicts all these affidavits, and most emphatically denies that he ever had such conversations, or made such remarks; that he was at the inquest a short time, but did not hear the evidence. He further swears that he never made the remark to any one that Hobbs ought to be sent to the penitentiary; that he made no effort to prejudice the minds of the jury against Hobbs; that he himself had no prejudice or bias whatever against the prisoner—on the contrary, had remarked before he was on the jury that he would not wonder if he (Hobbs) got clear. Bailey is supported in his statement by the affidavits of three other jurors, and on other points by the affidavits of three other persons.

The prisoner is entitled to a fair and impartial trial by a jury without bias or prejudice, and to that end the jurors are tried before being impaneled and sworn. But after the case is once tried, and the verdict rendered, the courts— especially appellate courts, where appeals are allowed— must, for quite obvious reasons, proceed with great caution in making such after-trial affidavits the ground for granting new trials. Hence they are subjected to careful scrutiny to see that the ground stated is sufficient, and that it is made to appear so clearly and certainly that the court can rely upon it as true with safety, and see therefrom that the prisoner has thereby suffered injustic. See *Smith's Case,* (1815) 2 Va. Cas. 6 ; *Poore's Case* (1825).*Id.* 474 ; *Kennedy's Case* (1826) *Id.* 510 ; *Brown's Case, Id.* 516 ; *Hughes's Case,* 5 Rand. (Va.) 655; *Jones's Case* (1829) 1 Leigh, 598; *Heath's Case* (1842) 1 Rob. (Va.) 735 ; *Hailstock's Case* (1845) 2 Gratt. 564 ; *Curran's Case* (1850) 7 Gratt. 619 ; *Bristow's Case,* 15 Gratt. 646 ; *Poindexter's Case,* 33 Gratt. 792 ; *Simmons* v. *McConnell,* 86 Va. 494–500 (10 S. E. Rep. 838); *State* v. *Strauder,* 11 W. Va. 745 ; *Sweeney* v. *Baker,* 13 W. Va. 158; *State* v. *Greer,* 22 W. Va. 800; *Beck* v. *Thompson,* 31 W. Va. 459 (7 S. E. Rep. 447); *Baker's Case,* 33 W. Va. 319 (10 S. E. Rep. 639); *State* v. *Harrison,* 36 W. Va. 729 (15 S. E. Rep. 982); Hill, New Trials, (2d Ed.) 175 ; 12 Am. & Eng. Enc. Law, 352.

"The rule is that in the appellate court great deference is paid to the opinion of the trial-court, passing upon such motion for new trial, and a new trial will not be granted for such matter unless it appear from the whole case, as shown by the evidence submitted to the court on the motion for a new trial (and not from the evidence before the jury) that the party suffered injustice from the fact that such juror served upon the case." *Beck* v. *Thompson,* 31 W. Va. 459–463 (7 S. E. Rep. 447); *State* v. *Greer,* 22 W. Va. 800.

In the case now in hand, the evidence tends to show that Juror Bailey was free from bias and prejudice ; that he had before the trial formed no deliberate opinion ; and the evidence that he had expressed before the trial the opinion of the guilt of the prisoner, and said that he ought to be pun-

ished, is contradicted; and the trial-court was evidently of the opinion that he had acted fairly and impartially, and that the prisoner had suffered no injustice from the fact of his serving on the jury.

The prisoner also assigns as error the refusal of the court to set aside the verdict, as not sustained nor justified by the evidence. The theory of the defence is that the killing was done in self-defence; and on this hypothesis, which there was evidence tending to prove, the Circuit Court instructed the jury fully and correctly. In such case the killing would not have been unlawful. If it had been unlawful, but not willful, in the sense of being done intentionally—as, for example, in doing certain unlawful acts, or in doing certain lawful acts in a careless, unlawful manner—then it might have been involuntary manslaughter, which our statute makes a misdemeanor. If it had been done unlawfully and willfully, but not deliberately, not with malice—as, for example, in hot blood—then it would have been voluntary manslaughter, which our statute says shall be punished by confinement in the penitentiary not less than one nor more than five years. If the killing had been done unlawfully and willfully, and also deliberately—that is, with malice (but not premeditatedly; that is, not with a previously formed design) as, for example, in cold blood —then, under our statute, it would be murder of the second degree, and punishable by confinement in the penitentiary not less than five nor more than eighteen years. If it had been done unlawfully, willfully, maliciously, and deliberately, and also premeditatedly—that is, with a previously formed design (previously formed for no matter how short a period) then it would be murder of the first degree, which is punishable with death, unless the jury also find that he be punished by confinement in the penitentiary, in which case he shall be punished by confinement in the penitentiary during his life. See chapter 144, Code, p. 895, (Ed. 1891) where forms of indictment are also given in which the words "deliberate" and "premeditated" are treated as synonymous, and the term "premeditated" dispensed with, in the statutory form of indictment. See 2 Bish. Crim. Law, § 728.

As the learned judge told the jury in this case: "Where a homicide is proved, the presumption in this State is that it is murder of the second degree, and the burden is on the State of showing, if she can, that it, was murder of the first degree; and upon the accused, of showing, if he can, that it was without malice, and therefore only manslaughter, or that he acted lawfully, and is therefore not guilty."

The jury had the witnesses before them, and returned a verdict of guilty of murder in the second degree. The learned judge presiding also saw the witnesses, and heard and saw them testify. He refused to disturb the verdict, but fixed the period of confinement in the penitentiary at five years—the lowest for murder of the second degree, the highest for voluntary manslaughter, according to the settled rule of law in such cases. We see no ground of reversal, and the judgment is affirmed.

Affirmed.