## CHARLESTON.

STATE *v.* McGAHAN.

Decided December 8, 1900.

1. DISORDERLY HOUSE—*Indictment Sufficient.*

An indictment (omitting the formal part) as follows: "Upon their oaths present and say that M. A. McGahan, on the 28th day of April, 1898, and thence continually, until the day of finding this indictment, at the county of Mineral, a certain ill-governed and disorderly house unlawfully did keep and maintain, and in said house, for her own lucre and gain, certain evil-disposed persons, as well men as women, of evil, name, fame, and conversation, to come together, on the days times aforesaid, there unlawfully and willingly did cause and procure; and the said person in the said house at unlawful times, as well in the night as in the day, on the day times as aforesaid, there to be and remain, drinking, tippling, cursing, swearing, quarreling, and otherwise misbehaving themselves, unlawfully did permit and suffer; to the common nuisance of all the people of this state, and against the peace and dignity of the state,"—*held* to be sufficient on demurrer. (pp. 439, 440).

2. NEW TRIAL—*Venue.*

It is error for a circuit court to refuse to set aside the verdict of a jury, and grant a new trial, where a party is convicted of a misdemeanor, where no evidence is adduced at the trial showing the offense to have been committed within the jurisdiction of the court trying the case. (p. 443).

Error to Circuit Court, Mineral County.

M. A. McGahan was convicted of keeping a disorderly house, and brings error.

*Reversed.*

J. N. McMULLAN and C. N. FINNELL, for plaintiff in error.

ATTY. GEN. EDGAR P. RUCKER and L. C. ANDERSON, for the State.

McWHORTER, PRESIDENT:

M. A. McGahan was indicted for keeping a disorderly house in the county of Mineral "on the 28th day of April, 1898, and thence continually until the day of finding this indictment, at the county of Mineral a certain ill-governed and disorderly house, unlawfully did, keep and maintain; and in said house for her own lucre and gain, certain evil-disposed persons, as well men as women, of evil name, fame and conversation, to come together, on the days times aforesaid, there unlawfully and willingly did cause and procure; and the said person in the said house at unlawful times, as well in the night as in the day on the day times as aforesaid, there to be and remain, drinking, tippling, cursing, swearing, quarreling, and otherwise misbehaving themselves, unlawfully did permit and suffer; to the common nuisance of all the people, of this State and against the piece and dignity of the State." Defendant demurred to said indictment, assigning as grounds of demurrer, that in using the language "and the said PERSON in the said house at unlawful times," etc., the indictment charges that but one person was disorderly, and the fact that one person only should behave badly at a hotel and saloon, by tippling, cursing, swearing, etc., is not sufficient to sustain such a charge as it is a crime which one person acting alone could not commit. In *State* v. *Halida,* 28 W. Va. 499, it is said: "The law is well settled that verbal inaccuracies which do not affect the sense are not fatal. Mere misspelling is not fatal," and cites Whart. Cr. Plead. & Pr. s. 273; *Shay* v. *People,* 22 N. Y. 317; *State* v. *Gilmore,* 9 W. Va. 641; *State* v. *Hedge,* 6 Ind. 333. It is there further held: "If the sense be clear, nice exceptions ought not to be regarded. And even when the sense or the word may be ambiguous, this will not be fatal, if it is sufficiently shown by the context in what sense the phrase or word

was intended to be used." The use of the singular word "person" instead of the plural of that word was a mere mistake in leaving off the "s," as is clearly shown by what follows, referring to "the said person in the said house at unlawful times," etc., the indictment says, "there to be and remain, drinking, tippling, cursing, swearing, quarrelling, and otherwise misbehaving THEMSELVES." One person might drink, tipple, curse and swear, but he could hardly quarrel alone or "misbehave themselves" alone. 1 Bish. Crim. Pro. s. 354, says, "Any clerical error which cannot mislead, or an error in punctuation, it (the indictment) will not be held ill for the defect." *State* v. *Wimberly,* 3 McC. 190; *Ward* v. *State,* 50 Ala. 120. The demurrer to the indictment was properly overruled. Bill of exceptions No. 3, defendenat objected to the question and answer therein set out; the State asked the witness, G. G. Cain, "State whether or not you ever saw Hat Trenton in the alley near Mrs. McGahan's." Answer, "Saw Hat Trenton lying in Mr. Duly's wagon in the alley, full, one night, and several men were there drinking beer at the time, don't know who the men were. The wagon was at Mr. Duly's stable, which is about one hundred and fifty feet from Mrs. McGahan's." The objection of defendant to question and answer was overruled, and the evidence admitted. There is no evidence showing that Hat Trenton had even been at the house of Mrs. McGahan on that day, and surely it was improper to permit to be given in evidence transactions that occurred one hundred and fifty feet from the house of defendant, and in the same bill of exceptions, it is shown that the State was permitted to show by witness H. G. Buxton that Sadie Rawlings and Mary Beseley left Keyser about three weeks before the trial, and witness was asked, "Did not Dr. Keys take Sadie Rawlings to Baltimore about three weeks ago?" and he answered by permission of the court over the objection of the defendant, "I have seen Dr. Keys on the train between Keyser and Baltimore, and saw Rawlings on the same train, but they were not together," and was also further permitted to state over such objection that he "saw Dr. Keys with Sadie Rawlings at a theatre in Baltimore two nights," and the evidence also of George Bane as set out in bill of exceptions No. 4, "Tell the jury what you saw take place up near Mrs. McGahan's." A. "Saw Frank Williams put his arm around Net Gordon about 8 p. m., one night. They were in the middle of Armstrong street a little below Mrs. McGahan's.

Dr. Keys was with Williams," all of which was immaterial, and if it had any effect at all upon the jury it must only be to the prejudice of defendant. What could the fact of these women leaving Keyser or attending theatre in Baltimore have to do with the matter in issue, nothing improper in the conduct of the women being shown either in their leaving Keyser or attending theatre in Baltimore. *State* v. *Brown,* 71 Md. 275; *Harzinger* v. *State,* 70 Md. 278.

It is claimed, as set out in bill of exceptions No. 5, that the court erred in refusing to instruct the jury to disregard the remarks of the prosecuting attorney in his argument closing this case "in reply to the charge of counsel for the defendant that he had shown undue zeal and feeling in the prosecution of this cause beyond that required as the representative of the State" in using the following language, "I ask a verdict at your hands because I have in this case a personal interest aside from my duty as prosecuting attorney. I have a boy I want to save." In *State* v. *Allen,* 45 W. Va. 65, (syl. pt. 6), holds, "Counsel necessarily have great latitude in the argument of a case, and it is, of course, within the discretion of the court to restrain them; but with this discretion the appellate court will not interfere, unless it clearly appears from the record that the rights of the prisoner were prejudiced by such line of argument." *State* v. *Shores,* 31 W. Va. 491. The record fails to advise this Court of the language used by counsel for defendant in making the charge referred to and to which the prosecuting attorney was addressing himself. Counsel for defendants are sometimes very severe in denunciations against representatives of the State, and the words used may have been a just retort, and we are unable to say that the court abused its sound discretion in refusing defendant's motion. The same exception contains further words used by the prosecuting attorney in his closing argument, which on motion of defendant to instruct the jury to disregard, the court refused, as follows: "You see how reluctant my witnesses were to testify. They would not tell half they knew. I could not ask them any questions to answer which would criminate them, but, if they were innocent, they should have gone to defendant's counsel, and compelled them to put them on the stand." Those remarks show that the prosecutor was given a large latitude by the court, ordinarily such a line of argument is very improper and should not be indulged in by counsel nor permitted by the court. The jury

had the witnesses before them and were able to judge for themselves pretty well whether they wre telling all they knew or whether they were withholding a part of the truth, but it is not proper for the prosecutor to tell the jury what the witnesses in his opinion knew about the case which they did not tell, or that they knew facts that would convict, if they would tell them. Conviction must be, if at all, on the evidence given, not on what might have been given. He has a right to comment on the manner, actions and appearance of witnesses, but not to testify in his argument in the case, and present facts for the consideration of the jury not in evidence.

Second bill of exceptions is to the giving of the following instruction: "The court instructs the jury that, if they believe, beyond a reasonable doubt, that the defendant kept a room in her hotel near the bar, for the purpose and with the intent of bringing together and entertaining prostitutes and men desirous of their company, and that such persons were in the habit of assembling there to drink and play cards together, then the jury should find the defendant guilty, even although they· may believe that the house was kept quietly and no conspicuous improprieties were permitted inside. And the fact that she had a hotel or liquor license cannot excuse the defendant, provided the jury find the house disorderly." There was evidence tending to show that the room kept near the bar was for the purpose of drinking, playing cards, and for general hilarious times, where women of evil name and fame were met by men who desired their company. In *State* v. *Beard,* cited, it is held that, "If in fact the place was kept by the traverser for the purpose and with the intent of bringing together and entertaining prostitutes and men desirous of their company, and that such persons habitually assembled there to drink and dance together, the jury might well find the house to be disorderly within the meaning of the indictment, and according to settled principles of law." It is there further held that "if such persons habitually assemble there to drink and dance together it is a disorderly house, although it is quietly kept, and no conspicuous improprieties are permitted inside." The very fact that such characters resort there to spend their time together in drinking and card playing is offensive to all good people of the community. As I understand it, a saloon is licensed for the purpose of selling drinks to its customers, and not for "a place of habitual resort of people of evil name and

fame there to consort together; thus affording opportunities for
and temptations to the indulgence of their bad habits and pas-
sions, to the evil example and scandal of the neighborhood." It
seems to be conceded, though not proved, except by inference,
that defendant had hotel and liquor license. If so such license
would not excuse her, if the jury should find from the evidence
beyond a reasonable doubt that she kept a disorderly house. She
has no license to keep such house. The instruction was properly
given.

It is insisted that the court erred in not setting aside the ver-
dict of the jury because contrary to the law and the evidence.
Because it is nowhere shown in the record that the house kept by
defendant is in the county of Mineral, and that the evidence
utterly fails to show beyond a reasonable doubt that defendant
kept a disorderly house. There is no evidence except by infer-
ence too remote for consideration that defendant's house com-
plained of is in Mineral County. T. A. Fifer testifies, "Am town
sergeant of Keyser. Went into office February 10, 1899, was
sent for and went to Mrs. McGahan's twice, but did not see any-
thing wrong. There was a drunken man in the saloon. I told
him to get out, and he went." Witness fails to say where the
house is located, whether in the town of Keyser or across the
river in Maryland. If he had said the house was in Keyser, this
Court perhaps could take judicial notice that the town of Key-
ser is the county seat of Mineral County, but is her place of
business in Keyser? Who has said it was? Not Sergeant Fifer?
Witness I. W. Nevelle says, "I work for the Keyser Electric
Light Company. Have been sent for to make repairs at Mrs.
McGahan's," but he does not say where Mrs. McGahan's is,
whether in Keyser, and it nowhere appears in the record except
in the indictment, itself, that the house complained of is in
Mineral County. "It is error for a circuit court to refuse to set
aside the verdict of a jury and grant a new trial, where a party
is convicted of larceny, when no evidence is produced at the trial,
showing the offense to have been committed within the jurisdic-
tion of the court hearing the case." *State* v. *Hoover,* 1 W. Va.
336; *State* v. *Mills,* 33 W. Va. 455; *State* v. *Hobbs,* 37 W. Va.
812, where, in the last case, it is held that "it is not necessary
that the proof should be direct that the crime was committed in
the county charged. It is enough if the proof be inferential but
sufficient." *State* v. *Poindexter,* 23 W. Va. 805, and *State* v.

*Allen,* 45 W. Va. 65.   The definition of "disorderly house" as
given in Bouvier's Law Dic. is, "A house the inmates of which
behave so badly as to become a nuisance to the neighborhood.   It
has a wide meaning, and includes bawdy houses, common gamb-
ling houses, and places of a like character."   In *Commonwealth*
v. *Hopkins,* 133 Mass. 381, (43 Am. Rep. 527) it is held, "A
house is disorderly which tends to public annoyance, although
only one person may actually have been disturbed."   There is
some conflict in the evidence as to the character of the house
kept by defendant, but the evidence was such as should be
weighed by the jury.   One witness says he lives near where de-
fendant kept a hotel and saloon, one door between them; heard
noise and confusion inside and outside, it was such as to dis-
turb the public; his tenant had complained to him about it.
Daughter-in-law of defendant testified that she lived in house
next door to defendant three years, had seen persons in there
(naming some of them) singing vulgar songs, heard vulgar talk,
had been annoyed by the same set of drunkards there a number
of times, etc.   John Harwess saw members of neggro troupe in
at Mrs. McGahan's drinking on Sunday within the last year; got
liquor there himself on Sunday.   Jacob Harrison, eighteen years
of age, said he had taken a drink in the saloon, wouldn't like to
say how many times, and evidence of other boys, minors, drink-
ing therein, while on the other hand some witnesses stated that
the house was not disorderly.   A case eminently proper for a
jury to pass upon.

For the reasons given herein the judgment will be reversed, the
verdict set aside and the case remanded for a new trial.

*Reversed.*