STATE, Respondent, v. BURMEISTER, et al, Appellants.

(277 N. W. 30)

(File No. 7977. Opinion filed December 30, 1937)

*Atwater & Helm,* of Sturgis, for Appellants.

*Clair Roddewig,* Atty. Gen., and *D. C. Walsh,* Asst. Atty. Gen., for the State.

ROBERTS, J. Defendants were jointly tried and convicted in Meade county of the larceny of 16 head of cattle, the property of E. R. Angel, and from the judgment of conviction and the order overruling their motion for new trial they appeal, relying principally for reversal upon the insufficiency of the evidence to prove that the defendants were connected with the alleged larceny or that the offense, if any, was committed in Meade county. It appears from the evidence that the ranch of the complaining witness. E. R. Angel, is in the southeast corner of Meade county, 8

or 9 miles west of the Cheyenne river, which flows in a north-easterly direction forming a part of the boundary line between Meade and Pennington counties. On the last day of June or the 1st day of July, 1935, the complaining witness saw his cattle, 28 in all, in his pasture. On July 14, he discovered that 16 head of his cattle were missing, including a holstein steer, a roan cow, a red and white spotted heifer, and two brock-faced steers. The pasture fence of three wires was up and the gate was closed, but it wasn't fastened in the way he had always fastened it. Searching for the cattle, the complaining witness on July 16 saw the defendant Ed Burmeister, who was employed on a ranch 6 or 8 miles northeast of the Angel ranch, and inquired if Burmeister had seen his missing cattle and was told by the defendant that he had not seen them.

B. E. Latham saw the missing cattle along the Cheyenne river about the middle of July. This witness for the State testi-fied: "I live four miles north of Wasta, in Pennington County, about three-fourths of a mile from the Meade County line. I run my cattle in Meade County. I saw a bunch of strange cattle. I noticed the natural markings and could remember the colors very easily. I recall one holstein steer, one roan cow, a brockle-faced steer, and the others were durham class of cattle. They seemed to be coming back west when I met them. I turned them around and drove them east across the river. I saw them the next day. The second time I saw them they were right where we had put in the drift fence. They were in Meade County on the west side of the river. There were seventeen head. The branded cow I found out belonged to L. D. Sorenson. He lives up the river about four or five miles in Pennington County. Both times I drove them east just across the river from the drift fence."

J. J. Trepanier, a witness for the State, testified that he resides 11 miles southeast of Wasta; that he saw defendant Ed Burmeister at about 5 o'clock on the morning of July 18 on horseback driving cattle. He testified that the defendant "was pushing them right along to the southeast. They were going into the head wind, ap-proximately sixteen head." On July 18, a man whose name was not known and who was not identified by either the prosecution or the defense, but who was riding a horse that bore the brand and

description of a horse owned by defendant Ed Burmeister, was seen driving the stolen cattle in the neighborhood of Conata, which place is approximately 30 miles south and 15 miles east of the Angel ranch.

Chris Heuther, a witness for the State, testified: "I reside at Conata in the Bad Lands. I know the defendant William Burmeister. I got acquainted with him a couple of years ago. He moved in there southeast of Conata with his cattle. He had his cattle in there at least two years. On the second day of August, he came over in the morning and made an agreement to hire me with a truck. I was to haul ten head of cattle. I did not see the cattle. Bill said they were east from Conata. I told him I couldn't haul them if my boy wouldn't drive the truck. I believe he said they were strays. He had his cattle in southeast of Conata. He moved them from Conata around by Scenic. He and I went to the ranch to see whether my son could get away. My son said he could. On August 4th, the boy drove up with the truck loaded with the cattle and the truck stood in front of my store for about an hour. Bill said: 'You can sell the cattle in our name if you want to or in the boy's name.'" When the son, Edward Huether, and this defendant reached Chamberlain they were stopped by the sheriff of Brule county who took possession of the cattle. The son testified that Burmeister told him that the cattle were his estrays and said nothing whatever about having traded for them.

Frank Walker, a witness for the State, testified: "I reside five miles southeast of Conata on the reservation line. I remember the occasion when William Burmeister was arrested in Chamberlain. I had seen him that morning. He had stayed at my place that night and had been there for five or six days before that. He was looking for his cattle. I did not see him with any cattle. He stayed nights there at my place during that period excepting one night. Immediately preceding that time there was a man riding after Bill's cattle. He was Tim Marvin, a brother-in-law, I believe."

William Burmeister testifying in his own behalf stated that in May, 1935, he moved his herd of cattle from the vicinity of Conata to leased land south of Scenic; that for several days prior to the trucking of the cattle he was in the vicinity of Conata for

the purpose of rounding up estrays. Testifying as to the manner in which he acquired the cattle belonging to the complaining witness, he said: "There was a time when I was riding in the basin that I met someone with some cattle. I don't remember exactly what date it was. It was right close to the first of August. I did not see this man coming into the basin. He and the cattle were on the creek there in the basin. I made a deal with that man for those cattle. He wanted to trade off the cattle and I traded him four head of horses for them. The horses were driven away by that man. He said he lived over north of the wall. He went in that direction when he left with the horses. I don't know this man. I did not ask his name. He did not ask my name." The brother Ed Burmeister denied that he had ever been in possession of any of these cattle.

This court seems committed to the view that the possession of recently stolen property by an accused and a third person connected with the original taking, where the joint possession appears to have originated subsequently, does not make such possession that of the accused, in the absence of other evidence, to the extent of justifying a jury in finding the accused guilty of larceny. State v. Mern, 39 S. D. 285, 164 N. W. 76. It is urged that the evidence under consideration is subject to the same objection. In the present case assertion of possession and exclusive dominion over the stolen property by defendant William Burmeister is unquestioned. There are facts and circumstances tending to connect him more or less directly with the theft and to show a preconceived plan to receive and dispose of the stolen cattle. When he was arrested, he claimed and later so testified that he met a stranger on the prairie in the vicinity of Conata driving 10 head of cattle and that he traded 4 horses for these cattle. He gave an indefinite description of the stranger, did not inquire as to his name, or make any subsequent effort to verify his claim. Contradictory statements were made by him to Chris Huether and his son Edward. This defendant told them that these cattle were estrays which he had failed to find when he moved his cattle from the vicinity of Conata during the previous spring. He admitted that he had been in that vicinity for several days prior to making shipment of the stolen cattle and had stated to persons there residing that he was search-

ing for estrays. The reasonableness and credibility of the explanation given by the accused as to the manner in which he acquired possession of this stolen property was a question for the jury in connection with other facts and circumstances in evidence State v. George, 39 S. D. 513, 165 N. W. 248; State v. Larson, 41 S. D. 553, 172 N. W. 114; Johnson v. Johnson, 50 S. D. 341, 210 N. W. 155; State v. Brundage, 53 S. D. 257, 220 N. W. 473. The defendant Edward Burmeister was seen driving these cattle on the morning of July 18, in the direction of the place where they were shortly thereafter admittedly in the possession of his brother William. This was contradicted by evidence offered for the purpose of showing that he was at his home at that time. We are of the opinion that the evidence was clearly sufficient to convict the defendants of larceny and upon the record before us we cannot say that the verdict was not an honest expression of the jury reached in an intelligent exercise of their discretion.

██ As to the contention that the evidence does not show the crime to have been committed in Meade county, we think that there was sufficient evidence to take this question of venue to the jury. The venue of an offense may be proved like any other fact in a criminal case. Absence of direct proof of venue does not defeat conviction where it is properly inferable from the evidence. It appears from the record that the owner of the stolen cattle resided in Meade county and the cattle were confined in a pasture near the dwelling of the complaining witness. True, the cattle were seen by B. E. Latham along the Cheyenne river and were on two different occasions driven by him across the river into Pennington county. While it was possible for the stolen cattle to have been outside of the county of Meade at the time of their theft, yet the probabilities are so strong that they were taken from the pasture of the owner that we cannot say that the jury was not warranted in believing the crime to have been committed in Meade county. See State v. Uren, 39 S. D. 15, 162 N. W. 745.

The following questions were propounded to a witness for the State by the State's attorney and the following answers were received over proper objections:

"Q. Do you know anything about the relationship between

Tim Marvin and Bill Burmeister? A. I believe he is a brother-in-law.

"Q. During the last five days that Bill was at your place did he say anything to you about Tim Marvin or his stock? A. Why. I don't remember.

"Q. Did he say anything to you about Tim Marvin in connection with riding for his strays? A. I believe he did. I wouldn't say for sure but I believe he asked—

"By the Court. Well, he didn't ask what he said.

"A. I am certain he did.

"Q. And what was said or in substance what was said about that, can you remember that? A. Bill asked me if I knew where Tim rode while he was down there.

"By the Court. Asked you what?

"A. If I knew which, what part of the country Tim rode while he was there."

The witness had testified that William Burmeister immediately preceding the time of his arrest had been in his vicinity searching for estrays and that Tim Marvin had likewise been searching. This defendant on cross-examination testified:

"Q. Well, did you have anybody particularly riding the range down there for you? A. Not particularly, no.

"Q. Well, who was it? A. Tim Marvin.

We find no prejudicial error in the rulings of the court.

Defendants seek to predicate error upon the claimed misconduct of the special prosecutor. The misconduct of counsel is not reviewable upon a settled record, but must be presented on affidavits. Sections 2555, 2556, Rev. Code 1919; State v. Wilcox, 48 S. D. 289, 204 N. W. 369; State v. Degner, 59 S. D. 539, 241 N .W. 515. The alleged prejudicial misconduct is not presented in this case upon affidavit and cannot therefore be considered by this court.

It is claimed by the defendants that the court erred in permitting evidence to be introduced in rebuttal that should have been introduced in the case in chief. The order in which testimony may be introduced is largely within the discretion of the trial court.

The evidence related to the description of a horse ridden by a person who was seen driving the stolen cattle on or about July 18, 1935, by a witness for the defense, in the vicinity of Conata, but who was not identified. While this testimony may properly have been introduced in chief, its admission in rebuttal was in no sense prejudicial.

Defendants requested the following instruction: "You are instructed that the crime of receiving stolen property, knowing it to be stolen, is a separate and distinct offense from that of the larceny under the laws of the State of South Dakota, and in this case if you believed that one or both of the defendants are guilty of receiving the property described in the information, knowing it to be stolen, then he could not be found guilty of grand larceny as charged in this information."

It is the contention of the defense that if the evidence tends to show that an accused's connection with stolen property began after it was taken by another he is entitled to an instruction upon receiving stolen property and that the court erred in its refusal to so instruct. The court instructed the jury at the request of the defendants that, though the jury believed from the evidence that defendant William Burmeister, when he received in Pennington county the cattle described in the information, knew that they were stolen, yet they could not convict him unless they found from the evidence that William Burmeister participated in or aided ,or abetted in the original taking of the cattle and that this would also apply to defendant Ed Burmeister. We think that the jury was fairly instructed and that no mistake could have been made in finding upon this particular question. If the defendants were not connected with the original taking, the jury should have acquitted, and it was so instructed. If the evidence was not sufficient to show a connection with the original taking, it was immaterial whether the evidence would sustain a conviction on a charge of receiving stolen property.

It is claimed that reversible error was committed in permitting the State peremptorily to challenge a juror and in excusing the juror after he had been accepted. The record does not show that at the time the court permitted the State to exercise this peremptory challenge the jury had been sworn to try the case. The

defendants did not exhaust their peremptory challenges, and it does not appear that a juror was forced upon the defendants against their objection. It was within the discretion of the court to permit the State to exercise such challenge though the juror had been accepted. State v. Rathjin, 46 S. D. 412, 193 N. W. 247.

The judgment and order appealed from are affirmed.

RUDOLPH, P. J., and WARREN and SMITH, JJ., concur.

POLLEY, J., (dissenting). I am not able to agree with the majority of the court in this case. The information charges that the cattle involved were stolen in Meade county. In order to give the circuit court of Meade county jurisdiction over the offense, it is not only necessary to charge the commission of the offense in that county, but the evidence must prove, and beyond a reasonable doubt, that the offense was committed in that county. This fact the evidence fails to show.

The stolen cattle had been kept in a fenced pasture on section 16, in township 3, north of range 13, east of the Black Hills meridian. Said township is near the southeast corner of Meade county some 7 or 8 miles west of the Cheyenne river. The Cheyenne river at that point runs approximately due north and forms the boundary line between Meade and Pennington counties; the east bank of the river being in Pennington county, while the west bank is in Meade county. Angel the complaining witness saw his cattle (28 head in all) in the pasture on the last day of June or the 1st day of July. On the 14th day of July he discovered that 16 head of his cattle were gone. He immediately made search throughout the surrounding neighborhood, but did not find the cattle and, in so far as the record shows, the cattle were not in the pasture nor were they seen by anyone after the last day of June or the 1st day of July until about the middle of July, when B. E. Latham, a witness who testified for the State, said that he saw the missing cattle in the breaks of the Cheyenne river. He said they were on the Meade county side of the river heading west and that he drove them back across the river into Pennington county, implying by the use of the word "back" that the cattle had just come across from Pennington county. On the following day he again saw the cattle

on the west side of the river and again he drove them back into Pennington county. This was at least 7 or 8 miles east of the Angel pasture and the cattle were never again seen in Meade county. The cattle were then running at large in Pennington county and there is no evidence that they had been stolen or in any manner interfered with by anyone up to that time. They were next seen on the 18th day of July. J. J. Trepanier testified that he saw the cattle about a half mile from his place early on the morning of July 18. This was in Pennington county about 15 miles from the nearest point in Meade county. He said that the cattle were then in the possession of the defendant Ed Burmeister, and that he was driving them in a southeasterly direction. This is the first time or place that either of the defendants is shown to have had any connection with, or control over, the cattle. There is no evidence to prove nor that tends to prove that either of them ever saw the cattle or knew of their existence prior to the morning of July 18. There is no other evidence in the record tending to fix the place of the larceny. This does not show nor tend to show that the larceny took place in Meade county but does show that it took place, if at all, in Pennington county.

The rule that a criminal case shall be tried in the county in which the crime was committed is as old as the common law. There has never been any deviation from such rule. This rule is stated in 16 C. J. p. 185 as follows: "Generally speaking, it is a fundamental rule of criminal procedure that one who commits a crime is answerable therefore only in the jurisdiction where the crime is committed, and in all criminal prosecutions, in the absence of statutory provision to the contrary, the venue must be laid in the county or district of the offense, and must be proved as laid."

The rule is supported by the following decisions: Gut v. Minnesota, 9 Wall. 35, 19 L. Ed. 573; McKenna v. Fisk, 1 How. 241, 11 L. Ed. 117; Patterson v. State, 156 Ala. 62, 47 So. 52; Dougan v. State, 30 Ark. 41; People v. Scott, 74 Cal. 94, 15 P. 384; Connor v. State, 29 Fla. 455, 10 So. 891, 30 Am. St. Rep. 126; Sweat v. State, 90 Ga. 315, 17 S. E. 273; Studstill v. State, 7 Ga. 2; Watt v. People, 126 Ill. 9, 18 N. E. 340, 1 L. R. A. 403; Campbell v. People, 109 Ill. 565, 50 Am. Rep. 621; State v. Rider, 46 Kan. 332. 26 P. 745; State v. McCoy, 42 La. Ann. 228, 7 So.

330; Com. v. Parker, 2 Pick., Mass., 550; State v. Miispagel, 207 Mo. 557, 560, 106 S. W. 513; State v. Crinklaw, 40 Neb. 759, 59 N. W. 370; State v. Pray, 30 Nev. 206, 208, 94 P. 218; State v. Moore, 26 N. H. 448, 59 Am. Dec. 354; State v. Stow, 83 N. J. L. 14, 84 A. 1063; People ex rel. Freel v. Downs, City Mag. Ct. N. Y., 136 N. Y. S. 440; Fisher v. Bullard, 109 N. C. 574, 13 S. E. 799; State v. Dangler, 74 Ohio St. 49, 77 N. E. 271; Com. v. Bartilson, 85 Pa. 482; State v. Donaldson, 3 Heisk, Tenn., 48; Sims v. State, 28 Tex. App. 447, 13 S. W. 653; Abbey v. State, 35 Tex. Cr. R. 589, 34 S. W. 930; Niles v. Howe, 57 Vt. 388; Anderson v. Com., 100 Va. 860, 42 S. E. 865; State v. Hobbs, 37 W. Va. 812, 17 S. E. 380; In re Eldred, 46 Wis. 530, 1 N. W. 175.

This rule has been adhered to in all of the states where the question has been presented. The one exception is the case of State v. Uren, 39 S. D. 15, 162 N. W. 745. In that case the venue was laid in Butte county while the evidence tended very strongly to show that the larceny was committed in Meade county. The court stressed the fact that the owner of the stolen property (two horses) lived in Butte county, a fact that was of no materiality whatever, and made the statement that: "There was sufficient evidence to justify the jury in finding that the horses were in Butte county when taken."

The majority of the court falls back upon the same subterfuge in this case. In the opinion they say that, "While it was possible for the stolen cattle to have been outside of the county of Meade at the time of their theft, yet the probabilities are so strong that they were taken from the pasture of the owner that we cannot say that the jury was not warranted in believing the crime to have been committed in Meade County."

There is no evidence to support a probability that either of the defendants took the cattle out of Angel's pasture or that they ever saw the cattle in Meade county.

The defendant William Burmeister contended that, while he may have been in possession of the stolen cattle, he acquired such possession by trading some horses for the same and pursuant to such contention requested the court to give the jury the following instruction: "You are instructed that the crime of receiving stolen property, knowing it to be stolen, is a separate and distinct

offense from that of the larceny under the laws of the State of South Dakota, and in this case if you believe that one or both of the defendants are guilty of receiving the property described in the information, knowing it to be stolen, then he could not be found guilty of grand larceny as charged in this information."

Such instruction was refused and error is predicated upon such refusal. This instruction should have been given. If defendant acquired the cattle by purchase or by trade, as he claimed, he could not properly be convicted of larceny, and whether he did so acquire such cattle was a question of fact to be determined by the jury upon an instruction properly submitting such issue to them. The refusal of this request was prejudicial error.

The judgment and order appealed from should be reversed.