[Criminal No. 785. Filed June 7, 1933.]

[22 Pac. (2d) 838.]

SID W. ELLERY, Appellant, v. STATE, Respondent.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Mr. K. Berry Peterson, Attorney General, and Mr. C. T. McKinney, Assistant Attorney General, for the State.

LOCKWOOD, J.—Sid W. Ellery, at the time of the acts with which this case is concerned superintendent of banks for the state of Arizona and hereinafter called defendant, was convicted of a violation of section 214, Revised Code of Arizona 1928, which reads as follows: "§ 214. Prohibitions on officials; penalty. It shall be unlawful for the superintendent or any examiner or employee of his office to borrow money, either directly or indirectly from a bank

under the jurisdiction of the department. Every person who shall violate any provision of this section shall forfeit his office or employment, and shall be guilty of a misdemeanor," and has brought this appeal before us. There are a number of assignments of error, but we shall consider them rather in the logical order of the propositions of law raised thereby than by the specific assignments made.

The first contention is that the section above quoted is unconstitutional for the reason that it refers to a subject which is not expressed in the title of the act containing it, in violation of section 13, part 2, article 4, of the Constitution, which reads as follows: "Section 13. Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title." In considering this objection we shall have to state briefly the manner in which the Revised Code of 1928 was adopted. In 1925 a commissioner was appointed charged with the duty of making a thorough and complete revision and codification of all the statutory law of the state of Arizona. This work was continued for two years and the commissioner made a report of his labors to the legislature which met in 1927. That legislature appointed a committee of its own members to assist him and to prepare for submission to a later session bills for the enactment of the new Code. Pursuant to this authority, there was prepared a complete revision of the statutory law of Arizona. A special session of the legislature was called to meet November 19th, 1928, one of the purposes being stated "to enact legislation to revise the civil and penal codes, the laws of Arizona." A number of different bills containing titles such as "Banks and Banking," "Public Finances," "Penal Code," etc.,

were then presented to and passed separately by the legislature, each bill containing the statement that it was adopted as "a part of the Revised Statutes of Arizona." These bills were numbered consecutively by chapters from 1 to 139 and by sections from 1 to 5349, instead of the chapters and sections of each separate bill beginning from 1 and running to whatever number was required to complete it. After all of these separate measures had been duly passed and submitted to and approved by the Governor, the legislature passed and adopted Senate Bill No. 100, which was presented to the Governor on the fourth day of January, 1929, and by him signed on the fifth day of January, subsequent to the passage and approval of all of the separate bills before referred to. We quote the bill in full with the exception of the space represented by stars. In that space is found in regular order, divided into parts, chapters and sections entitled and numbered substantially as they appear in the printed Code of 1928, the entire statutory law of Arizona up to that time, both civil and criminal.

"State Senate
"Eighth Legislature
"Fifth Special Session
"Senate Bill No. 100
"An Act to Revise, Codify and Adopt A Revision and Codification of the Laws and Statutes of the State of Arizona and Declaring an Emergency
"Be it enacted by the Legislature of the State of Arizona:
"Section 1. That the laws and statutes of the State of Arizona, revised, codified, harmonized and reduced by the Code Commissioner appointed by the Governor under the provisions of Chapter 35, Session Laws Seventh Legislature, 1925, as further prepared for submission to the Legislature by the Legislative Code Committee, under the provisions of Chapter 31, Session Laws, Fourth Special Session, Eighth Legislature, 1927, and as amended and adopted by the Eighth Legislature, Fifth Special Ses-

sion, 1928, be and the same are hereby enacted as the laws and statutes of the State of Arizona, which said laws and statutes are as follows: * * *

"Section 2. Each and all of the aforesaid laws and statutes shall take effect and be in force at 12 o'clock noon on the first day of July, 1929.

"Section 3. All laws and statutes of a general nature now in force, are hereby repealed, said repeal to take effect at 12 o'clock noon, on said first day of July, 1929.

"Section 4. The incorporation herein of initiated and referred measures is not to be deemed a legislative reenactment or amendment thereof, but only a mechanical inclusion thereof into the revised laws and statutes.

"Section 5. Whereas, in order that there be no confusion, uncertainty or doubt regarding the laws and statutes of the State of Arizona, it is necessary for the public peace, health and safety that the provisions of this Act become immediately operative; therefore an emergency is hereby declared to exist, and this Act shall be exempt from the referendum provisions of the State Constitution."

Then follows in regular form the usual signatures of the officials who are required to sign any bill before it becomes law.

There can be no doubt whatever from the foregoing recital of facts that it was the intention of the legislature of Arizona to adopt the entire statutory law of Arizona as a new and single measure, but that feeling that this perhaps would be unconstitutional it took the added precaution of passing separate bills on various subdivisions of such law and then, *after* this was done, of adopting the general enactment above quoted. If it was in its power to adopt an entire Code by a single act under a single title, there is no doubt that this was done, for Senate Bill 100, *supra,* was subsequent in its enactment to all of the separate bills, and the validity of the subject matter thereof, so far as it is constitutional, depends, not upon the

passage of the previous separate bills, but upon the adoption of the later single one, for if a law be passed by the legislature and later adopted in regular form a second time, it is the second enactment which gives it force and validity as law from that time and not the first one.

Let us then consider whether a legislature may revise and codify the entire statutory law under one title, and if so, what that title must contain? This question was considered by the Supreme Court of Washington in *Marston* v. *Humes,* 3 Wash. 267, 28 Pac. 520. In that case the court said:

"Again, it would hardly be contended that it is not competent, under the provision in question, for the legislature to enact as a single law a code of civil procedure, and that an·act entitled, 'An act to provide a code of civil procedure' would be invalid, yet under this subject innumerable subheads and subjects can easily be carved out. Such title is good, because the legislature has seen fit to take a comprehensive subject which can properly cover all of such subjects. If the legislature can thus by a name sufficiently comprehensive embrace all the subjects properly relating to civil procedure, it must follow that, by adopting a subject sufficiently general, it can embrace in one act all the statute law of the state. In other words, the legislature may adopt just as comprehensive a title as it sees fit, and if such title, when taken by itself, relates to a unified subject or object, it is good, however much such unified subject is capable of division. I have come to this conclusion, not only from the necessities of the case as they appear to me, but from such authorities as I have been able to find on that subject. Mr. Cooley, in his admirable work upon Constitutional Limitations, makes use of the following language: 'The generality of a title is no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having the necessary or proper connection. The legislature must determine for itself how broad and

comprehensive shall be the object of a statute, and how much particularity shall be employed in the title in defining it.' Cooley, Const. Lim., p. 174. Mr. Justice READ, in a carefully considered opinion, quotes with approval the following language in referring to the title of the act in question: 'Whether the description of the subject might not with propriety be more specific, it seems to me, is a question for the legislature, rather than the courts. The purpose of the 16th section was that neither the members of the legislature nor the public should be misled by the title, not that the latter should embody all the distinct provisions of the bill in detail.' *Blood* v. *Mercelliott,* 53 Pa. St. 391. Mr. Justice VALENTINE, in passing upon this question, used the following pertinent language: 'The subject to be contained in a bill under section 16, art. 2, of the constitution, which provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title," may be as broad and comprehensive as the legislature may choose to make it. It may include innumerable minor subjects, provided all these minor subjects are capable of being so combined as to form only one grand and comprehensive subject; and if the title to the bill containing this grand and comprehensive subject is also comprehensive enough to include all these minor subjects as one subject, the bill, and all parts thereof, will be valid.' See *Division of Howard Co.,* 15 Kan. 194. Quotations of this kind could be continued indefinitely. In fact, we have been unable to find a single case which has sought to interpret the word 'subject' when used in the way it is in our constitution, in any other than this liberal way. If the legislature sought to enact the entire body of the statute law of the state as one enactment, and to entitle the same, 'An act to establish a code of laws for the state of Washington,' such title would clearly come within the definitions above quoted, and I can see no reason why it would not be good. It is true that the legislature and the public are not informed at all as to the particular terms of the various provisions of law which are intended to be embraced under such title, but are

thereby informed clearly and fully that the one subject or object of the act to be enacted thereunder is the establishment of an entire code of statute law, and are as much advised of the details in fact, though perhaps a little less in theory, as they are by a title to provide a code of civil procedure. . . . ''

The Supreme Court of Florida had a similar question before it in the case of *Martin* v. *Johnson*, 33 Fla. 287, 14 So. 725, considering an act whereby the statutes of the state of Florida were enacted as a whole, and in substance reached the same conclusion. Indeed, we have found no authority which holds to the contrary.

The title of the act passed by the legislature in which it attempted to adopt the Code as a whole was ''an act to revise, codify and adopt a revision and codification of the laws and statutes of the state of Arizona.'' We think, as is stated in *Marston* v. *Humes, supra,* both the legislature and the public are informed by this title that the one subject or object thereof is to enact an entire Code of statutory law, and that such being the case they are advised in substance, although not in detail, that any conceivable legislation which may constitutionally be adopted may be contained within such Code. Counsel for defendant have cited us to the cases of *Board of Control* v. *Buckstegge,* 18 Ariz. 277, 158 Pac. 837, and *Skaggs* v. *State,* 24 Ariz. 191, 207 Pac. 877, and urged on their authority that we have in effect held a provision such as section 214, when enacted as we have set forth, to be in violation of section 13, part 2, article 4, of the Constitution, *supra.* We are unable to see wherein those cases so hold. Indeed, in the Buckstegge case we think the implication therefrom rather supports the constitutionality of the present law than denies it. Therein we said:

'' . . . The purpose of these constitutional provisions, it may be said generally, is to prevent sur-

prises that were frequent in legislation prior to their adoption. There was a time when titles of acts were of little importance, and not infrequently bore no relation to the legislation that followed. Omnibus, hodgepodge, and logrolling legislation with all their evils were more or less prevalent. It is said: 'These provisions are intended to prevent the evils of "omnibus bills" and surreptitious legislation.' 36 Cyc. 1017.

"By confining the legislation to the subject contained in the title, neither the members of the Legislature nor the people can be misled to vote for something not known to them or intended to be voted for.

"This provision of the Constitution does not require that the title of an act should minutely and in great detail describe the legislation proposed; it is not necessary that the title be a synopsis or a complete index to the legislation. The title of the act, however, should be sufficiently full and comprehensive as to indicate, in a general way at least, what is to follow in the way of legislation. It should not be so meager as to mislead or tend to avert inquiry into the contents thereof. . . .

"The requirements of this constitutional provision are liberally construed by the courts. There is no purpose to hamper or defeat or embarrass legislation by putting a strained or technical construction upon it. Black's Constitutional Law, 329. And if the courts entertain any reasonable doubt as to the validity of the law, they would sustain it. Under this provision, the title of an act plays a very important part. It is necessary because, without it, there can be no legislation. It may be made narrow and restricted, in which case the legislation must likewise be narrow and restricted, or it may be made broad and comprehensive, extending the legislation, providing it is germane to the subject mentioned in the title. . . . "

The purpose of this constitutional provision is merely to advise the legislature and the public as to what they may expect to find in the act. If the act is such that it would be naturally assumed by a legislator or voter that the particular part in question

might properly be included under the title, his constitutional rights are protected. It is not necessary that the title of the act be an index to the statute.

In the Skaggs case the Codes under consideration were those of 1913. At that time the Penal Code was passed as a separate and distinct act from the Civil Code. Its sections and chapters were so numbered that they obviously had no connection with the Civil Code, which was separately sectioned and numbered, and we held in that case that a provision which was properly civil legislation could not be embraced in the Penal Code. This has no connection with the present situation, where the Code as finally enacted was one single act and not two. The title to Senate Bill 100 was broad enough to include section 214, *supra.*

This necessarily disposes of the next contention, that since that section merely declares the act therein forbidden to be a misdemeanor and provides no specific punishment in the section, none can be inflicted. Section 4485 of the Code contained in the same act specifically states the punishment for all misdemeanors where the penalty is not otherwise provided, and all parts of a single act must necessarily be construed together. We hold, therefore, that section 214 was constitutional and the penalty set forth in section 4485 applied to it.

The next question we consider is the sufficiency of the information. It is urged that the information charges a direct and not an indirect borrowing in the first part thereof and then in the second part shows that the borrowing, if any, was indirect. It will be noted that the section on which the information was drawn makes it unlawful for the superintendent of banks to borrow money either directly or indirectly from a bank under the jurisdiction of the department. If, therefore, the information charges such borrow-

ing, it makes no difference whether it is alleged that it is done in a direct or indirect manner. The information states, as it may under section 4978, Revised Code of 1928, the particular circumstances of the offense. It is obvious from reading it as a whole that it charges the borrowing, if any there was, was indirect and not direct. The question then is: Does the information state facts which would show an indirect borrowing? It shows substantially the following was the situation: Prior to the fifteenth day of April defendant was indebted to the Old Dominion Bank in the sum of approximately $5,000, and being desirous of retiring such loan he solicited the Arizona Bank to make a loan of $5,300, and in order to conceal the fact that the loan was to him he caused the bank to be given as evidence of such loan a promissory note signed by his brother, which note was secured by certain collateral, but that the whole of the loan so made was intended to be and was by the defendant for himself and for his sole use and benefit and none of it by his brother, and wherever in the entire transaction the name of his brother appeared it was used and intended to be used as a subterfuge to conceal the fact that the defendant himself was the real borrower from the Arizona Bank. This is, in our opinion, an allegation in substance that the defendant desired to and did borrow the money for himself from the Arizona Bank and used his brother as a mere cloak to conceal the true facts regarding the loan. The information, in our opinion, alleges an indirect borrowing from a bank under the official supervision of defendant, and since an indirect borrowing is just as much prohibited by law as a direct one, it charges a public offense. It is contended most strenuously by defendant, and this is the heart of his argument on the information, that since, as he contends, no recovery can be had on a promissory

note against anybody but a signer thereof and since the note which was given to the Arizona Bank was not signed by defendant, but by his brother alone, defendant could not have been a borrower from the bank.

We think counsel have confused the loan itself with the evidence. A promissory note is not a loan, but merely evidence thereof. We think it will not be contended that had the bank chosen to waive the note and sue defendant merely on the indebtedness, if it were able to prove that he was the real party who received the money, it could not recover. Indeed, counsel for defendant admitted as much in oral argument. It is true the bank if ignorant of the true facts could have held the brother on the note, but had it admitted its prior knowledge of the real situation its only remedy would have been against defendant and then only if the parties were held not to be *in pari delicto*.

We think this demonstrates conclusively that the defendant, assuming the facts alleged in the information to be true, was the real though indirect borrower. In our opinion the very purpose for including the word "indirectly" in the statute was to prevent transactions of the nature of that alleged in the information.

We have read with care the case of *State* v. *Pielsticker*, 118 Neb. 419, 225 N. W. 51, cited by defendant. Whether or not we could go so far as that court does and hold that a *bona fide* borrowing by a partnership, one member of whom was prohibited from borrowing directly or indirectly, would not be a violation of the statute, is not necessary for us to determine herein, for the entire theory of both the information and the evidence offered by the state is that the loan was made for the purpose of evading the provisions of the statute and that defendant's

brother had no real interest in it. We think under the circumstances herein the Nebraska court would have reached the same conclusion we have, for it says: " . . . There is no question but if the defendants in this case had used this partnership as a subterfuge for the purpose of borrowing money from the bank in reality for themselves, such an act would constitute an indirect borrowing. The trial judge well said in his memo: 'If the word "indirectly" as used in the statute under consideration is confined to include only those acts by which the officer of the bank uses some other person, firm or corporation as a subterfuge or a blind to make a loan in reality to himself, then it is given not only its ordinary and plain meaning, but also a definite and certain meaning which would be readily understood by any layman reading the statute.' . . . " The information states a public offense.

The next objection which we consider is that the evidence fails to show the defendant while superintendent of banks borrowed money either directly or indirectly from a bank under the jurisdiction of his department. The evidence and the reasonable inferences therefrom taken in the most unfavorable manner to the defendant, as we must take it under the verdict of the jury, shows the following situation: Some time during the last of October, 1931, defendant was indebted to the Old Dominion Bank at Miami in the sum of something over $5,000. About that time he was offered the position of superintendent of banks. On reading section 214, *supra,* he was inclined to doubt whether or not he could continue his loan with the Old Dominion Bank as aforesaid. He therefore made arrangements with his brother W. J. Ellery, who resided in Monrovia, California, to execute a note for the purpose of having a loan made by the Old Dominion Bank which on its face

was to W. J. Ellery instead of defendant. The Old Dominion Bank, receiving a statement from W. J. Ellery showing his financial condition, agreed to accept his note in lieu of that of defendant. Defendant's note was secured by certain collateral and this was transferred as security for the W. J. Ellery note. With the proceeds of this last note and some other small sums of money, the defendant's note in the Old Dominion Bank was fully paid. Defendant was thereafter duly appointed superintendent of banks effective November 1st, 1931. On or about the middle of April the condition of the Old Dominion Bank became somewhat precarious, and on the 14th or 15th of April the note signed by W. J. Ellery was paid. Just before this payment a loan in the sum of $5,300 was negotiated by defendant with the Arizona Bank in Phoenix, which was under his jurisdiction as state superintendent of banks aforesaid. The note which evidenced the loan was also signed by W. J. Ellery and not by defendant. The latter, however, took the entire active part with the Arizona Bank in regard to the negotiation of the loan, and its proceeds were deposited in such a manner that he could check on them, and as a matter of fact all checks drawn on such account were drawn by him personally, although in the name of his brother. The Old Dominion loan was paid partly by checks drawn by defendant on his own account, and partly by a check drawn by him on the deposit which was the proceeds of the loan made by the Arizona Bank as above. Some time in the middle of June the Arizona Bank also was discovered to be in an unsatisfactory condition. Payments had been made on the note of W. J. Ellery in the Arizona Bank at different times, all of the money used in such payments coming directly from the personal bank account of defendant or by checks drawn by him from accounts maintained

in other names but subject to his check. On June 16th defendant appeared in the Arizona Bank in company with an attorney named Graham Foster and paid the entire balance due on the note in question in currency. There is no evidence that W. J. Ellery in person had anything to do with any of the transactions mentioned, except that he signed the note in the Old Dominion Bank and the one given to the Arizona Bank, and signed and partially filled in certain statements regarding his financial condition. Both of the notes signed by him were secured by the same collateral which secured defendant's original loan, with the exception of a note of defendant's wife payable to W. J. Ellery and perhaps a few shares of stock of various natures. Defendant himself took the active part in negotiating the loans of which the notes signed by W. J. Ellery were evidence, made all the payments thereon, and in general handled the entire transaction from beginning to end. In view of this evidence we think a trial jury was justified in finding that the loan from beginning to end was on behalf of defendant, that it was for his personal interest and profit, and that W. J. Ellery had merely loaned his name as a cloak to his brother for the purpose of enabling the latter to avoid showing on the records of the two banks in question that he had borrowed money from them. Defendant's own testimony shows that he knew of the existence of section 214, *supra,* and was attempting to avoid violating it. Unfortunately the method which he chose merely led to the commission of the offense which he wished to avoid. Had he left with the Old Dominion Bank the original obligation which he had therein there would have been no violation of section 214, *supra,* although it might have been thought by some that it was not in accordance with the highest standard of ethics that he should be in-

debted to any bank over which he had supervision. But the statute does not forbid the existence of a previous indebtedness, but of the borrowing of money directly or indirectly while the party is in office. The whole intent of the statute is that the courts should look, not to the form through which the transaction was carried on, but to whether as a matter of fact a member of the state banking department directly or indirectly borrowed money from a state bank. This, as we have seen, there is evidence to justify the jury in holding that defendant did.

The next question which we consider is whether the court should have instructed the jury that only those whose names appear on a promissory note can be held liable for the payment of the note. While this is a correct statement of law, we think it was entirely unnecessary. The question before the jury was not who was liable on the note, but whether the defendant had directly or indirectly borrowed the money evidenced by the note. It would have made no difference as to who was formally required to pay the note or what collateral was annexed thereto.

The next objection is that evidence was admitted as to where the money came from to pay the $5,300 note executed by W. J. Ellery in favor of the Arizona Bank. In view of the contention by defendant that the loan was really made by and on behalf of W. J. Ellery, we think it was highly relevant and material to find from whom the money really came which paid the note. When it is claimed that one is the real debtor on an indebtedness which on its face binds another, it is certainly highly material as to who actually paid the debt. Whether or not proof of this fact incidentally disclosed that defendant had or had not committed some other crime does not affect the right to offer the evidence.

The next question is whether the instruction in regard to presumption of innocence was reversible error. The court gave the following instruction: ''The presumption remains with the defendant throughout every stage of the trial and until such time in the progress of the case as you become satisfied of the guilt of the defendant of the charge upon which he stands accused, beyond a reasonable doubt and to a moral certainty.'' This instruction standing alone is doubtless improper, but taken into consideration with the further instructions of the court that the jury was admonished that they should not form any opinion as to the merits of the case until it was finally submitted to them and that the presumption of innocence remains with the defendant through every stage of the trial, we think the jury could not have been misled, and the instruction, though erroneous, is not reversible error.

The next matter complained of is that the court commented on the evidence when he told the jury that the fact that the bank did not suffer any loss as a result of the transaction was not a defense to the charge, and that the jury might consider the fact, if they so found it to exist, that the payments on the notes were made out of the defendant's own funds, in determining whether he was the true borrower or not. We think the instructions stated the law exactly, and that there was no comment on the evidence therein.

The last proposition which we need consider is alleged prejudicial remarks of the county attorney in the opening argument. The record shows that the statements of counsel in opening argument were not taken by the reporter. Counsel for defendant, it appears from the transcript, did claim that two statements were made which were objectionable, and the county attorney in substance denied he had made

at least the portion of the statement which might have been objectionable. The court thereupon instructed the jury to pay no attention to any remarks of counsel which were not borne out by the evidence. We think if there was any error this remedied it.

There are some other matters presented, but in view of our previous remarks we think they are not sufficiently important to require discussion.

We think we should say in justice to defendant that we believe that there was no intention on his part to defraud anybody of anything. He did, however, evidently think that the situation as it existed before he took office required changing in order that he might accept the office tendered him, but unfortunately for him he took an illegal method of making the change. Whether he really believed that such a change as he made was perfectly legal or whether he made it to make an illegal transaction appear legal we cannot say. The trial judge evidently believed that there were many equities in his favor, from the fact that it imposed no sentence of imprisonment and merely a fine. The whole situation may be summed up in the old saying, "Oh what a tangled web we weave, when first we practice to deceive," and is a warning to all public officers that whenever it appears necessary that they should conceal from the general public the whole truth in regard to any matter affecting their official rights and duties they are treading on dangerous ground.

For the foregoing reasons the judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.