SWEAT *et al. v.* THE STATE.

90　315
95　94

1. Where it appears that two or more persons without a warrant arrested another, believing or pretending to believe that he was a fugitive from justice, and at the same time took possession of his coat hanging near by, in the pocket of which was a bag containing a sum of money; that after putting handcuffs on him they proceeded to convey him to an adjoining county, carrying his coat along with them, and having ascertained while on the way that it contained money, counted it and returned it to the pocket, saying they did not want it, but wanted him; that upon his promise not to escape, and with a threat to kill him if he attempted it, they took off the handcuffs, after which the party proceeded to the home of one of the captors in the latter county, where the money was treated as still the money of the captive, who was consulted by them as the owner and whose leave to deposit the coat with the money in it in a certain room for safe-keeping was asked and granted; and that afterwards, during the same day, whilst he was still in their power and custody and the money was still in this place of deposit, they, by exciting and operating on his fears, using not only threats of carrying him to prison unless he would let them have fifty dollars of the money, but also saying that if another crowd, who they pretended were in search of them, got hold of him, "*there would be no getting away,*" thus hinting, perhaps, at mob violence, induced him to consent that they might take that sum, and thereupon the room in which the coat was deposited was opened, the money taken out and, in his presence, fifty dollars of it counted and kept by the captors, the rest of it, with the coat, being carried away by him, and he on these conditions being suffered to depart: *Held*, that the offence of robbery by intimidation was committed, and that the venue of the offence was the county in which the

captors finally reduced the fifty dollars to their exclusive posses-
sion, and not the county in which they made the arrest and seized
the coat.

2. A ground in a motion for new trial which complains of the admis-
sion of evidence without setting out the evidence in terms, but
designating it simply as the testimony of a certain named witness
stating "what his feelings, surprises and suspicions were when
he met the prosecutor," and relating "the conversations had with
him," is too vague and indefinite to be considered by a reviewing
court.

3. Newly discovered evidence which is merely cumulative or which
tends to impeach a witness is not cause for a new trial. There
was no error in refusing a new trial.

March 26, 1892. Argued at the last term.

Criminal law. Robbery. Venue. Practice. Evi-
dence. Before Judge ATKINSON. Ware county. At
chambers, February 21, 1891.

James and Randall Sweat were indicted for robbery,
alleged to have been committed upon George Snider on
August 19, 1889, in Ware county. They were tried in
November, 1889, and found guilty. Their motion for a
new trial was overruled, and they excepted.

Snider, the prosecutor, was a witness for the State.
The material part of his testimony was as follows: "On
the 19th of August I was picking cotton, and Randall
Sweat and Proff Taylor came in the cotton-patch and
arrested me without any warrant or showing at all, and
handcuffed and carried me away from there on a horse.
They took my coat which had $62.25 in it, and would
not let me have it. They carried me about a mile and
a half, and then decided that the coat was worth a
dollar a day to take it. I told them then there was
$62.25 in it. They counted the money and put it back
in the shot sack it was in and put it back in the
pocket, and claimed they wanted me, not the money.
I asked them to take the handcuffs off. They said
no, there was some danger of my getting away. I told
them I was willing to go anywhere they had a mind
to carry me, and then they took the handcuffs off and

said if I tried to get away they would kill me. They first took me to the house of James Taylor, in Ware county. They stayed there until after dinner, and stayed out in the lane shooting at a mark two or three hours I suppose. Nothing was said there about the money to me; stayed there about two hours or two and a half. I left there and went with James and Randall Sweat to James Sweat's. When we got there they took my coat that had the money in it, and locked it up in the post-office. They asked me if I wanted it locked up, and I told them they could if they wanted to. They locked it up and would not let me have it. They tried to get me to own what I had done. I told them I had not done anything and wouldn't own what I had not done. They claimed I had killed two men in Texas. At last they claimed that if I would let them have fifty dollars I could get loose and get away, and they would try to get me another hat and a pair of shoes. They said if the other crowd got hold of me there would be no getting away, but they thought I could get away if I would let them have the fifty dollars. They talked about sending me to Waycross, and that was the only terms they could turn me loose under, that I would let them have the money. They said I would have to come to Waycross jail if I did not let them have the money. So I let them have the fifty dollars. I was so badly frightened I did not know what they would do. That was the only way that I could get loose. They decided to count the fifty dollars, and I told them if that was the only show I would let them have it, and James Sweat said, 'Let's count it before anybody comes.' They opened the post-office and got the money out. Randall Sweat counted out fifty dollars and kept it and left me twelve dollars. They sold me a hat for fifty cents after they got the fifty dollars. They did not get the shoes, only the hat. I wore the shoes I had on. They told

me I would have to clean up from there, but gave me no instructions as to where I should go. They told me to travel the road at night, and if I heard anybody coming to crawl off and hide and take to the woods the next day. They told me that I must leave the State and I must change my name, and not mention their names or anything of that kind, but to get away from there. They made me trample my old straw hat in a briar patch before James Sweat's house. I bought a black wool hat from them. I left there after dark. James Sweat got up something for me to eat, so I would not have to stop until next day. . . It was at James Sweat's house in Ware county that they got the money. I was in great fear of danger if I did not let them have the money; I was frightened. I stayed at James Sweat's house, before I left, I suppose two and a half or three hours. The first I saw of James Sweat was when we overtook him as we went away from Randall Crew's. Joe Taylor was with him, and we all went along together. This was on the morning of the 19th of last August. I had been working at Joe Taylor's before I went to Crew's. I had been working in Ware county— had worked for McRae and Minchew and Taylor. I got the money in Florida. Minchew kept it a week. It was in the way and I was afraid I would lose it. Came to Ware county from Florida in July, 1889. . . Went to Minchew's and worked a week, and went to Joe Taylor. I was arrested at Randall Crew's, in Pierce county. . . I left James Sweat's about three quarters of an hour after dark on the same day that they got the money. I ate supper before I left. The Sweat boys got my money. They gave me back my coat and things, and after they got the money I took supper with them. . . When I was arrested I did not have on the coat. They claimed that they did not want the money when it was counted out after the arrest, but wanted me,

James Sweat was postmaster, and my coat was locked up in the post-office. After supper they sold me a hat and asked me if I did not want something to eat, so I would not have to stop. They fixed up something. They counted the money before supper. I got the coat after supper. . . I saw James Sweat once before I was arrested. It was at Joe Taylor's about five days before I was arrested. I talked to him. I was with him about three quarters of an hour—long enough to pull a row of fodder across the field."

The motion for a new trial contains the general grounds, a special ground which is set out in the opinion, and a ground of newly discovered testimony, supported by the affidavit of one Ruis, to the effect that he saw Snider after Snider returned to the county in which the alleged robbery took place. He asked Snider about the report of the taking of his money by defendants, and Snider told him that they did not get his money, and said he did not want to talk about the matter. Snider made this statement to him before the trial, but deponent did not say anything about it to any one, because he did not want to be a witness in the case, for the reason that he was a friend to both the Lees and Sweats, and the Lees had done him favors and he did not want to make them angry with him; but since the conviction of defendants he met one of them and felt it was his duty to tell him what Snider had said, and did so. Also, the affidavit of Mary Sweat, to the effect that she was passing James Sweat's house on the afternoon of August 19, 1889, about two hours by sun, and saw persons there, naming them, among them Andrew Sweat, Carey Sweat and one Bell. The relevancy of this affidavit will appear from the following: Upon the trial Carey and Andrew Sweat were witnesses for the defendants, and testified that they were present at James Sweat's house on the afternoon of August 19th, when George Snider was

brought there, and their testimony strongly tended to sustain the statements of defendants as to what occurred. Bell testified for the State, that Carey and Andrew Sweat were not there at the time in question; if they were he did not see them; they may have been hid away, etc.    One Waters testified for the State, that about two hours by sun on the day in question, Carey Sweat went home from Waters' place, which was about half a mile from James Sweat's; that Carey did not go toward James Sweat's but went the other way, saying he was going home; and that witness did not know whether he afterwards went to James Sweat's house or not. There were affidavits of various persons as to the good character and good reputation for truth of Ruis, and an affidavit of defendants and their counsel, touching their previous ignorance of the matters stated by Ruis and Mary Sweat, and their diligence, etc.

In the bill of exceptions it is alleged, as one reason why the decision overruling the motion was erroneous, that there was no evidence showing that any crime was committed by defendants in Ware county.

LEON A. WILSON and JOHN C. McDONALD, for plaintiffs in error.

W. G. BRANTLEY, solicitor-general, contra.

BLECKLEY, Chief Justice.

1. "Robbery is the wrongful, fraudulent and violent taking of money, goods or chattels from the person of another by force or intimidation, without the consent of the owner." Code, §4389. The indictment charged robbery by both force and intimidation. The verdict found the accused guilty of robbery by intimidation. Did the facts proved in behalf of the State, accepting as true all the evidence of the principal witness, embrace the necessary legal elements of the offence found? The material evidence of this witness, or the full substance of it,

may be seen by reference to the official report. Other witnesses were examined, and some of the facts mentioned below are derived from their testimony.

Snider was a strolling laborer, a stranger in this State, having been here for only one or two months. He was the owner of sixty-two dollars in money. While he was engaged in picking cotton for one Crew, in Pierce county, the money then being in his coat pocket, and the coat being in the field where he was at work, though, not upon his person, a party of four men came to the vicinity in search of him. Two of them remained out of sight whilst the other two went into the field and arrested him. They put handcuffs on him, took possession of his coat, and then, with him as a prisoner, rejoined the two who had lingered behind. The whole party then proceeded in the direction of Ware county. On the way, and while still in Pierce county, Snider told them that there was money in the pocket of the coat. The bag containing it was taken from the pocket, the money counted, replaced in the bag, and restored to the pocket; the captors saying they wanted him, not his money. At his request and upon his promise not to escape, they took off the handcuffs, with a threat to kill him if he attempted to get away. A halt of some hours was made after reaching Ware county, during which he remained a prisoner. This was at the house of one Taylor. Two of the party went no farther (one of them, perhaps, not so far), and did not participate in what afterwards took place. The other two, the men indicted and convicted of the robbery, both of them civil officers of Ware county, one a justice of the peace, the other a deputy-sheriff, carried their prisoner, with his coat and money, to the residence of one of them, the J. P. At this place was a post-office and the J. P. was the post-master. It was in Ware county about five miles from the farm on which the arrest was made. Here Snider,

v 90-21.

though a prisoner and not allowed to control his coat and money, was recognized and consulted as the owner. His leave was asked and obtained to deposit the coat in the post-office.   Afterwards by putting him in fear his consent was extorted for them to take and keep fifty dollars of the money.   They did not in express terms make any direct threat of violence, but what they said was, considering the circumstances and his state of mind, well calculated to excite his fears and was certainly intended to have that effect.   They claimed that he had killed two men in Texas.   They talked about sending him to Waycross, the county town; said he would have to come to Waycross jail if he did not let them have the money, and that if the "other crowd" got hold of him there would be no getting away, but they thought he could get away if he would let them have the fifty dollars.   What other crowd was referred to is not explained by the evidence.   No doubt it was invented for the purpose of vaguely hinting some mysterious danger, such perhaps as mob violence.   They did not pretend or profess to have any authority for their proceedings.   So far as appears, they drew entirely upon their imaginations, not only for the other crowd but for the killing of the two men in Texas.   He was in their power and they had threatened to kill him if he attempted to escape.   They had kidnapped him by abducting him and carrying him forcibly and against his will from Pierce to Ware county.   Construing their conduct and their words together, they did something more than threaten him with imprisonment in Waycross jail; they raised in his mind the apprehension of some vague and indefinite violence to his person, either from themselves or from others whom they designated as the other crowd.   He describes the state of his mind thus: "I was so badly frightened I did not know what they would do. . . I was in great fear of danger if I did not let them have the money—I was frightened."   He declared at the time

of his arrest the nature of the fear which that proceeding excited. He said all he was afraid of was they were going to kill him. This appears from the evidence of one of the Taylors. There is every probability that the fear which then began was increased by what followed. Well might a simple-minded laboring man be frightened by such lawless and desperate conduct, and by such mysterious and insinuating conversation on the part of men who had for the time being acquired a complete dominion over his person. Their purpose was to deprive him of his money, not by open force and violence, but by obtaining his formal consent for them to take it. In order to procure this consent it was necessary for them to operate upon his fears. This they did most effectually. They deny in their statements to the court and jury that they took his money at all, but this denial has been discredited by the jury. We agree with the jury in thinking that a robbery by intimidation was committed.

Was the offence perpetrated in Pierce or in Ware county? It has already been stated that the party which went into Pierce county consisted of four men. These were the two Sweats and the two Taylors. Some of the evidence indicates that James Sweat was the original and prime mover in the proceeding. Very likely the other three men took part in it at his request; and it is altogether probable that the Taylors acted in good faith under the belief, induced by the representations of James Sweat, that Snider was a fugitive from justice. The men who actually made the arrest in Pierce county were Randall Sweat and Proff Taylor. They secured not only the prisoner but the coat which had the money in the pocket. But neither of the Taylors kept up their connection with the enterprise until the money was finally taken. They dropped out, one of them sooner perhaps, the other at the first stopping place after the party reached Ware county. The Sweats alone did the balance. When the Taylors with-

drew, no robbery had been completed. Up to that time the declared purpose was to take Snider, not his money, and there was no avowed change in the purpose until after James Sweat's house was reached and the coat with the money in it had, with Snider's permission, been deposited in the post-office. The request for that permission implied that the money, as well as the coat, was still the property of Snider, and had not absolutely been taken from him. True, he was not allowed to have independent control of it, but he was not allowed to control himself. He was a prisoner, and certainly it cannot be held that when one is in custody, although unlawfully, he has been already robbed by his captors if they have, after violently seizing him, assumed control of his money as well as of himself, and will not for the time being allow him to do as he pleases with either. He may be robbed afterwards either by detaining his money and suffering him to go, or by carrying away his money and forcing him to remain, provided that in doing either, intimidation be used to effect the object. In this case the taking which occurred in Pierce county was but a partial or qualified taking. It became complete and final in Ware when the *animus furandi* first manifested itself with certainty respecting it. Even if this *animus* existed on the part of the Sweats at the time of the arrest, the act of taking may be considered as a progressive one, having its beginning in Pierce and its completion in Ware. It is certain that but for what occurred in Ware no robbery would have been consummated. If Snider had been allowed to carry away his money when he left Sweat's house, all which had then or previously occurred would at most have amounted only to an attempt to rob. No court could or would hold that a robbery had been perpetrated. Our conclusion is that the offence was committed in Ware county, and consequently that the superior court of that county had jurisdiction.

2. One ground of the motion for a new trial is in these words: "Because the court erred in allowing the witness McGahee, for the State, to testify, over the objection of the defendants' counsel, what his feelings, surprises and suspicions were when he met the witness and prosecutor, George Snider; and further, in allowing the said McGahee, over objections of defendants' counsel, to relate the conversation had with said George Snider, the defendants not being present, said conversation being had subsequent to the time the robbery was alleged to have been committed and not being a part of the *res gestæ*, and was hearsay and illegal, and tended to prejudice defendants' case before the jury; said objections having been made at the time of the introduction of said evidence, upon the ground herein stated." Certainly this is too vague and indefinite to be considered by a reviewing court. It is impossible to say what the evidence was which is here complained of. Whether it might be ascertained by looking out of the motion and exploring the brief of evidence we are not called upon to say, inasmuch as our dealings are only with errors plainly and distinctly assigned. When oral evidence is to be brought under review, the bill of exceptions need not recite it, if there is a recital of it in the motion for a new trial. To this extent the bill of exceptions may be aided by the motion, but as to oral evidence which neither of these recites, the question of error in admitting or rejecting it is not duly represented.

3. The newly discovered evidence was merely cumulative or impeaching, or both, and was therefore not cause for a new trial. There was no error in overruling the motion.                *Judgment affirmed.*