186 P.2d 346

**STATE v. STEPHENS et al.**

**No. 976.**

Supreme Court of Arizona.

Nov. 10, 1947.

220

James M. Corbett, of Tucson, for appellants.

John L. Sullivan, Atty. Gen., and William P. Mahoney, Jr., Asst. Atty. Gen., for appellee.

LA PRADE, Justice.

Defendants, J. W. Stephens, Sr., and his two sons, J. W. Stephens, Jr., and Leon Stephens, were convicted of the crime of robbery. From the judgment and order of the trial court denying them a new trial they have perfected this appeal. They have made numerous assignments of error, three of which we believe to be worthy of consideration. Their first assignment of error is that the verdict and resulting judgment are contrary to law. A kindred assignment is that the verdict is contrary to the weight of the evidence. Their third assignment complains of claimed prejudicial remarks of the deputy county attorney in his argument to the jury.

The evidence discloses a rather strange situation. To attempt to fathom the intentions of defendants by applying rules of common horse sense to their conduct leads the orderly mind into stray paths. Before we consider the evidence we believe it advisable to have before us the statutory definition of robbery. Section 43-5101 of our code reads as follows:

"Robbery defined—Fear—Penalty.—Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence and against his will, accomplished by means of force or fear. The fear may be either of an unlawful injury to the person or property of the person robbed, or of a relative or member of his family; or of an immediate and unlawful injury to the person or property of any one in the company of the person robbed at the time of the robbery. Robbery is punishable by imprison-

ment in the state prison not less than five [5] years."

With this definition of the crime before us we will make an extended investigation into the fact situation developed on the trial.

At about 9:30 p. m. on December 11, 1946, the complaining witness, a young man by the name of William R. Gregg, left his brother's home on the outskirts of Tucson and walked to Prince Road where he intended to catch a bus to Tucson. Having missed the bus, he started to walk down the road, at which time defendants approached him in their car. He hailed them, "thumbing" to indicate that he would like to ride. The car stopped some feet beyond him; he approached and entered, seating himself in the rear seat of the four-door, two-seat sedan. It later developed that the car was driven by J. W. Stephens, Sr.; J. W. Stephens, Jr., was sitting in the middle; and Leon Stephens to the right of him. J. W. Stephens, Sr., observed that he never failed to pick up a hitchhiker and began a conversation about highjacking. In this regard he addressed the two boys, saying that if they highjacked him they wouldn't receive much as he had only thirty-five cents. At this point we will let the story unfold through the testimony of the complaining witness Gregg:

"A. He kept talking along those same lines, about how little money he had on him and how hard it would be for him if they took his car, and I thought it was a manner of conversation, so I entered into the conversation and said that I thought it wouldn't be worth their while to highjack him, and we were then about Fort Lowell Road, and they asked him for cigarets, and he said he didn't have any, and the fellow in the middle from where I was sitting, *it looked like he was holding a gun on the driver,* and the driver was getting uneasy, and when he asked for cigarets and this fellow said he didn't have any, then the young fellow said, 'You have, too; you have some in your pocket.' He said, 'That is right, I do have, I smoke once in a while,' and so he reached in his pocket and gave the boys some cigarets.

"Q. What happened? A. Just prior to that, something was mentioned about the boys wanting to go to El Paso, and they asked about how far it was to El Paso, and he said he didn't know, that he had only lived here ten years, and after he gave the boys the cigarets the fellow in the middle offered the cigarets back to him, and the other boy said, 'Just keep them; we might need them,' and after they proceeded along on First this fellow said *he didn't have a thing, that the car was insured, and if they wanted that, let them have it,* and he said, 'If it is insured, they won't get very far with the car,' and the fellow in the middle, to my impression, *was holding a gun on the driver,* he said, *'We don't want your car, we rather have you do your own driving.'* I saw by that that I was in the wrong party and I asked to be let out of

the car. I said, 'If it is too crowded, I'll ask you to let me out,' and the fellow in the middle said, 'We'll let you know if we want you to get out.' All the way along First the fellow driving drove very slowly and the little fellow in the middle jacked him up about going too slow, and the fellow driving said, 'We will have to go through town and I've got to stop some place, there is a stop sign up here a little ways,' and the guy in the middle said, 'We'll let you know where to go and you won't have to stop,' and by that time we were down on First just about to St. Luke's in the Desert, and this boy said, 'You turn left here and go on,' and he turned on that street and we went several blocks and then turned again on Santa Rita. About the time we turned off First I asked them why they wanted to go to El Paso, and the guy in the middle said, 'We're not asking you any questions; we didn't ask you what you had for breakfast,' so when we turned off that street again on to Santa Rita the old fellow made a remark, 'If I had any money I would gladly give it to you boys, but I don't have a penny.' I had a few dollars on me, so I felt that in order to get out of the car, we turned off Santa Rita on to Helen and stopped just a few car lengths off of Santa Rita, and I said, 'If I give you my twelve dollars, will you let me out?' and the big fellow (J. W., Jr.,) said, 'Yes, we will,' so I gave them the twelve dollars and got out of the car and at the same time I heard the driver get out on the other side of the car, and I asked him if he knew the license number of the car, and to come in and we would phone the police."

When the car stopped the complaining witness noticed that the father, also was alighting from the car, whereupon the complaining witness asked him if he knew who the boys were, to which inquiry the father said, "No," nor could he remember the license number of his car. Gregg and the father went to a telephone and called the police. Gregg reported to the police substantially the foregoing testimony. The father then took the phone, at the request of the police officer, and reported the robbery. Gregg testified further that in view of what had transpired he was afraid of being molested, and that he tendered his twelve dollars because he was in a state of fear and thought it might make it possible for him to get out of the car; that from what was said and done he was afraid for the driver of the car; that at the time he (Gregg) alighted from the car, J. W., Jr., told him to walk to the rear of the car; that J. W., Sr., at the time Leon jabbed him in the ribs, demanding cigarets, told him to put it away (Gregg thinking he was referring to a gun). The witness testified:

"A. And just after that conversation is when he supposedly took the cigarets from the old man and acted like he nudged him with the gun, and that is when I first got uneasy.

"2. And you thought there was a ruckus going on or a hold-up or highjacking? A. Yes, sir."

Gregg testified that he handed the twelve dollars to J. W., Jr.; that J. W., Sr., offered his money to the boys; that when Gregg asked to leave the car one of the boys said to him, "We will let you know when we want you to get out."

With reference to the demand made on him for money by the boys, J. W., Sr., testified as follows:

"A. I said, 'If you are figuring on getting any money off of me, I haven't got it.'"

With reference to taking the car the father on cross examination testified as follows:

"Q. And you say you did not tell the officer what the officer testified you did? A. He only asked me if my car had been taken, and I said it was. He said, 'Do you know what the number was?' I didn't, I said, 'No, I don't, 4–F something'.

"Q. Did he ask you who took it? A. No.

"Q. You didn't tell him, did you? A. I didn't tell him.

"Q. And it was your two sons, J. W. Junior, and Leon, was it not? A. That is right, it was.

"Q. And you never at any time told the police, until they questioned you the next day, as to who really took it? A. No.

"Q. You didn't attempt to clarify the situation at all that evening, when you talked to the police officers? A. No, I didn't.

"Q. You didn't tell them about it being your two sons? A. No."

Mr. Stephens, Sr., on cross examination was asked if he hadn't told the officers that he was unable to describe the two fellows who had taken his automobile. He denied that such a question had been put to him or that he had made that answer. In explanation he testified:

"A. I told them I wouldn't describe them.

"Q. That you would not. A. That I would not, yes, that is right.

"Q. Why wouldn't you describe them? A. Simply because this guy, this Desk Sergeant or whoever it was, made me go over and sit down on a box and stay there.

"Q. So you wouldn't tell him who it was? A. I just refused to tell him. I suppose he could smell whiskey on me."

Shortly after receiving the telephone call the police went to the Stephens' home where they picked up J. W., Sr. J. W., Jr., testified that after leaving Gregg and his father he and his brother drove around the block two or three times expecting to pick them up with an expressed desire to return the car to his father and the money to Gregg; that he was unable to find his father or Gregg; that he drove Leon to an address on East Broadway and then went home, at which time his mother told

him that the father had been arrested and asked him to "ditch" the car; that he drove the car some few blocks away from the father's home and parked it near a curb. The police testified that, when both boys were arrested later in the evening, J. W., Jr., admitted, in referring to the cigaret incident that he had "nudged" his father.

The police officer also testified that at the time of his arrest the father reported "that he picked Mr. Gregg up and that at near St. Lukes he stopped the car, threw his billfold in on the seat and ran back of the car." When Leon was arrested the police officer testified that he said "that Mr. Gregg threw over to him in the front seat some money, and that he wadded the money up and threw it in the glove compartment of the car." At the time the car was recovered the twelve dollars was in the glove compartment. The police officer testified that upon the first questioning each defendant denied having had anything to do with the occurrence under investigation. The police officer in reporting the telephone conversation with Mr. Stephens, Sr., testified as follows:

"* * * I asked him who he was, and he said, 'Mr. Stephens,' and I said, 'Have you been robbed tonight?' He said, 'Yes, I have been robbed of my automobile and billfold, which contained between forty and fifty.' I asked him what kind of an automobile it was, and he said it was a Mercury sedan, but he said, 'I can't remember the number, the license number.' I said, 'Is it an Arizona number?' He said 'Yes, it is.'

J. W., Sr., in reference to the car incident and the demand of the boys for the car, testified as follows:

"* * * They asked how far it was to El Paso, and I told them I didn't know, but if they figured to take my car, there wasn't enough gas in it to go to El Paso, and I didn't have any money. I had fifty-four or thirty-four cents, I believe."

J. W., Jr., testified that Gregg said "If you fellows are going to be rough you might let me out," and "If you will let me out I will give you what money I have got." Then with reference to the conversation he had with the police officer he testified:

"A. He says, 'Mr. Stephens, why don't you come clean on this?' And he says, 'You know you was in on it.' And I told him, I said, 'Has my father confessed yet?'

In explanation of his attempt to hide the car, J. W., Jr., testified:

"Q. And you came back home and your mother told you the police had been there, and then you took the car and ditched it? A. Yes, sir.

"Q. Why? A. Because my mother asked me to.

"Q. Not because you thought you had done anything wrong? A. No, because I didn't think my father and this other guy had reported this as robbery."

On cross examination, J. W., Jr., was asked this question:

"Q. Did you ever tell the police that you had a conversation about highjackers with your father? A. No, sir.

"Q. I will ask you if you made this statement to Sergeant Yeazell, * * * 'Dad said, I am not a highjacker, and if you guys are highjackers I have only got forty-five or fifty cents. You can have that if you want it'? A. Well,—

"Q. Wait until I finish. 'We drove along and the fellow in the back seat said, "If there is going to be any highjacking, you can have my money."' A. Yes, sir.

"Q. Did you make that statement to Sergeant Yeazell? A. Yes, sir."

J. W., Jr., gave the following version with reference to why his father left his wallet in the car:

"Q. Jewel, did your father ever give you his wallet when he got out of the car? A. I think he left his wallet in the front seat.

"Q. Gave it to you? A. No.

"Q. When he got out, he took it out of his pocket and left it in the front seat, is that right? A. Yes.

"Q. Then you took the wallet and put it in the glove compartment? A. I never saw—I know my mother took his wallet when I got home.

"Q. Out of the glove compartment? A. I think she got it out of the glove compartment."

Defendant Leon Stephens on direct examination and in response to questions propounded by his counsel admitted that he had been in trouble before; that he had been convicted of a felony and had served time. Leon testified that he and his brother had been endeavoring to secure the consent of their father to their borrowing the car, and that they had talked about it during the time Gregg was in the rear seat. He testified that Gregg spoke up and said: "Now, this little argument is getting too rough, let me out; I will give you what I got. I ain't got but twelve dollars."

Appellants, in support of their assignment of error that the verdict and judgment are contrary to law, admit that a robbery may be accomplished merely by putting the victim in fear, but they strenuously insist that the putting in fear must be accomplished by the use of force and violence. Counsel for defendants with a great deal of zeal and industry has examined all the Arizona cases relating to robbery. He asserts that his careful examination of all these decisions discloses not a single case in which the taking of personal property in the possession of another was accomplished by means of fear alone, unaccompanied by force. We have not had time to examine all these cases and see no necessity to do so. Our statute specifically provides that robbery may be accomplished

by means of force or fear. In the early case of Ramirez v. Territory, 9 Ariz. 177, 80 P. 391, 392, the defendant was convicted of the crime of robbery. The complaining witness testified that at a time when he was drunk he felt somebody (the defendant) come up behind him and run his hands in his pocket and then run off. The judgment was reversed, the court commenting as follows:

"* * * While the evidence might be sufficient to sustain a charge of larceny, there is absolutely no evidence in the record showing or tending to show any force used by the defendant, any fear on the part of the prosecuting witness, or any intimidation by the defendant calculated to place the prosecuting witness in fear. Force or fear being requisite to constitute the crime of robbery, that offense was not established. * * *".

In this Ramirez case the court readily recognized that the crime could be accomplished by force or fear "or any intimidation by defendant calculated to place the prosecuting witness in fear." In Lear v. State, 39 Ariz. 313, 6 P.2d 426, 427, the court said:

"If the person is not made to surrender the possession of the personal property by means of force or fear, the dominant element of robbery is not present."

In Brown v. State, 34 Ariz. 150, 268 P. 618, it was recognized that robbery could be accomplished by engendering fear through threats when supplemented by force, actual or constructive. It makes no difference how the fear is engendered.

"The fear of bodily injury sufficient to support a charge of robbery may be aroused by a word, or gesture, * * *." 54 C.J., p. 1021, sec. 36. Citing cases.

Even indirect language of a threatening character may be sufficient to constitute intimidation. Sweat v. State, 90 Ga. 315, 17 S.E. 273, at page 275. Where no force or violence is used to engender the fear there must be such conduct on the part of the wrongdoer as would be reasonably calculated to put the victim in fear and cause him to part with his property for that reason. Commonwealth v. Titsworth, 98 S.W. 1028, 30 Ky. Law Rep. 402.

The quantum of conduct sufficient to constitute legal constructive force or intimidation is set forth in the text statement of American Case Law as edited in American Jurisprudence. See 46 Am.Jur., Robbery, sec. 16:

"* * * No matter how slight the cause creating the fear may be or by what other circumstances the taking may be accomplished, if the transaction is attended with such circumstances of terror, such threatening by word or gesture, as in common experience are likely to create an apprehension of danger and induce a man to part with his property for the sake of * * *"

his person, the victim is put in fear.

We have purposely set forth a rather complete statement of the evidence which was before the jury. We did this for the reason that we determined it was necessary in making an application of the evidence to the foregoing rules. We believe that the purpose of defendants' statements and conduct was to engender fear on the part of the complaining witness. He was lead to believe that Stephens, Sr., was being abducted, and that he, himself, was being abducted. He was a captive in a moving car; had been refused permission to leave the car; and had been told that he would leave the car if and when the two younger defendants determined they would permit it. It is not sufficient that the fear engendered arise from the mere temperamental timidity of the victim. State v. Parker, 262 Mo. 169, 170 S.W. 1121, L.R.A. 1915c, 121. Gregg's fright was truly an objective fright. It was the sole province of the jury to pass upon the honesty, integrity, and judgment of the complaining witness. We pointed out in State v. Tuttle, 58 Ariz. 116, 118 P.2d 88, 90:

"* * * Those who see and hear the witnesses testify are in a much better position to weigh their testimony than we, and in passing on questions of fact are more apt to be correct than we. * * *"

This language was quoted with approval in Moore v. State, 65 Ariz. 70, 174 P.2d 282, at page 284, opinion by Stanford, C. J.

We think that the evidence reasonably justified the jury in concluding that the complaining witness had been "needled" to the point of desperation, and that through fear he surrendered his money to secure his liberty. His state of fear was confirmed by Stephens, Sr., who with him reported to the police that they had been robbed and that Stephens, Sr., had lost his car to the robbers. The conduct and incriminating statements of Stephens, Sr., subsequent to his arrest, reasonably justified the jury in concluding that he was particeps criminis and had played a leading role in the demonstration that had been "staged" to place the complaining witness in a state of fear.

■ Appellants also complain that the verdict and judgment are contrary to law in that there was no taking of any personal property. They assert that the complaining witness voluntarily gave up his property; that it was a "giving" rather than a "taking." The definitions of robbery and the illustrations have without exception shown that there must be a taking and asportation of the personal property. The taking may seem to be with consent while in reality it is the surrender of the property from fear. Long v. State, 1852, 12 Ga. 293. If the victim places his property in the hands of the robber through force or fear without raising a protesting voice or hand, such act is not of his volition, but at the will of the robber. In other words it would be the victim's act not his deed—his submission but not his will.

It would be a distorted concept to say that a man might be pricked with hot irons or put in a state of terror by direct or indirect threats, gestures, and statements and conclude that he had not been robbed merely because he offered his personal property to gain surcease from pain or his release. If such were the law all robbers could resort to such conduct and wait for the victim to give without making a demand. That such is not the law is stated in the early text entitled "A Treatise of the Pleas of the Crown" by Edward Hyde East, Esq., of the Inner Temple, reported in East's Pleas of the Crown, vol. 2, p. 711 (edited in 1803), wherein the author, in commenting on the case of Rex v. Blackham (1787), says:

"Blackham assaulted a woman with intent to commit a rape, and she without any demand from him *offered* him money, which the prisoner took and put into his pocket, but continued to treat her with violence to effect his original purpose, till he was interrupted by the approach of another person. This was holden to be robbery by a considerable majority of the judges; for the woman, from violence and terror occasioned by the prisoner's behavior, and to redeem her chastity, offered the money, which it was clear she would not have given voluntarily; and the prisoner, by taking it, derived that advantage to himself from his felonious conduct; though his original intent were to commit a rape." (Emphasis supplied.)

We have not been cited to any case nor has our industry been able to disclose a reported case since the case of Rex v. Blackham, supra, wherein the victim was tortured into giving, but in this case "a considerable majority of the Judges" were of the opinion that the "giving" under such circumstances was in fact the "taking" within the contemplation of the definition of robbery. It was commonsense then: it is commonsense now.

[5–7] In considering the sufficiency of the evidence to establish fear and taking, we have set forth at length the evidence to sustain these two elements of the crime. In so doing we have necessarily delved into the field as to the sufficiency of the weight of the testimony. This court has on many occasions committed itself to the proposition that in reviewing the sufficiency of the evidence to support a conviction the evidence on review is to be viewed in the light most favorable to the state. See Bradley v. State, 35 Ariz. 420, 279 P. 256; Macias v. State, 36 Ariz. 140, 283 P. 711; Cole v. State, 41 Ariz. 1, 15 P.2d 238. Not only must the evidence be viewed in its strongest light in favor of the verdict, but all reasonable inferences therefrom must be taken in most unfavorable manner to defendant. Ellery v. State, 42 Ariz. 79, 22 P.2d 838. When these rules are applied to the evidence as we have heretofore delineated and analyzed, we conclude that the verdict and judgment are not contrary to the weight of the evidence. The evidence

was sufficient in law to justify belief on the part of the jury that the appellants were guilty. "There is no rule more decisively settled by this court than that we will not disturb a verdict sustained by competent testimony, on the ground of the weight of the evidence." Johnson v. State, 33 Ariz. 354, 264 P. 1083, 1087.

[8, 9] We shall now advert to the third assignment of error wherein it is claimed that the deputy county attorney in his remarks to the jury made statements that were prejudicial to the rights of the defendants. The argument of the deputy county attorney complained of reads as follows:

"I was rather surprised this afternoon when the smaller Stephens boy, J. W. Junior, told you people from the witness stand that he had robbed him. This man, if you will recall, told you that. In my experience that is the first time that I have ever heard a man who has entered a plea of not guilty tell you right from the witness stand, tell all the jurors that he is guilty. * * *"

These statements and argument undoubtedly refer to testimony of J. W. Stephens, jr., which in part we have set forth above but for clarity's sake will set forth again. On cross examination, J. W., Jr., admitted that he told the police officer:

"Dad said, I am not a highjacker, and if you guys are highjackers I have only got forty-five or fifty cents. You can have that if you want it."

"We drove along and the fellow in the back seat said, 'If there is going to be any highjacking, you can have my money."

In reference to his father's giving up his wallet, J. W., Jr., was asked this question, "Did your father ever give you his wallet when he got out of the car?" to which the witness answered, "I think he left his wallet in the front seat." The witness further testified that, when he couldn't find his father and Mr. Gregg after letting them out of the car, he was "scared that Mr. Gregg was going to say we had robbed him, but I didn't think my father would, I thought my father would tell him it was a joke or something, you know." The jury did not believe that it was a joke. The jury believed the state's witnesses, which was solely its province.

The jury is at all times the sole judge as to what has been testified to by any witness. In view of the testimony of defendant J. W. Stephens, Jr., the remarks of the deputy county attorney constituted no more than his appraisal of the testimony. Oftentimes counsel in addressing the jury will say, "You recall that the witness so-and-so said so-and-so"—when in truth and fact the witness made no such statement. Whether the witness testified to any particular fact is for the determination of the jury. The court specifically instructed the jury as follows:

"You are further instructed that arguments of counsel, both for the prosecution and the defendants, must be in accordance

with the evidence introduced in this case, and if you have heard any statement from any counsel, either for the prosecution or the defendants, which will not accord with the evidence which you have heard, you will not consider such statements as against or for the defendants in any respect."

The prosecutor was merely arguing that in his opinion the testimony of defendant J. W. Stephens, Jr., was in effect an admission or confession of his guilt. An expression by a prosecutor of his conviction regarding the defendant's guilt has been held not to be prejudicial error where the court has admonished the jury to disregard the remarks of counsel and to render its verdict on the evidence. Blackburn v. State, 31 Ariz. 427, 254 P. 467. We conclude that the remarks of the deputy county attorney were a legitimate argument and constituted no error.

The evidence given was legally sufficient to sustain the verdict and the judgment should be affirmed. It is so ordered.

UDALL, J., concurring.

STANFORD, Chief Justice (specially concurring).

On the presentation of this case by argument I could not see the justice of an affirmance of the judgment and sentence of guilty of these defendants. My reasons were supported by the shortness of time the prosecuting witness had to make up his mind that he should part with his money by reason of fear. The ride, which was requested by him, was but a few minutes in duration; they were entering or about to enter Tucson; no direct threat was made against the prosecuting witness and no weapon was exhibited to create fear. It is true that the rule that this court set forth in the case of State v. Tuttle as quoted in the body of this opinion should be persuasive—the rule being that jurors are in better position to weigh the testimony that are we—yet to my mind, as I now concur in the opinion so ably written by Justice LA PRADE, I do believe, in addition to the foregoing, that the sentence was excessive, and that the defendants should have the advantage of this specially concurring opinion for future use.