372 P.2d 718

STATE of Arizona, Appellee,

v.

Manuel SILVAS, Appellant.

No. 1175.

Supreme Court of Arizona,
En Banc.

June 27, 1962.
Rehearing Denied July 13, 1962.

Flynn & Allen, Phoenix, for appellant.

Wade Church, former Atty. Gen., E. D. McBryde, former Pinal County Atty., T. J. Mahoney, former Deputy County Atty., Robert W. Pickrell, present Atty. Gen., for appellee.

JENNINGS, Justice.

Defendant, Manuel Estrella Silvas, was tried and convicted of first degree murder. From the conviction and a sentence of death he appeals. The material facts, pursuant to our usual rule, will be stated in the light most favorable to sustaining the conviction. State v. McGee, 91 Ariz. 101, 370 P.2d 261 (1962); State v. Evans, 88 Ariz. 364, 356 P.2d 1106 (1960)

The defendant, a married man, lived with his family in Coolidge, Arizona, where he operated a small tavern. Beatriz Mankel, a married woman, resided in Casa Grande, Arizona, with her husband, children and mother. For approximately nine months prior to February 12, 1959, the defendant and Mrs. Mankel had been having an affair. Defendant had acknowledged his illicit romance to his wife although not as to the woman's name or place of residence.

On February 11, 1959, shortly before 11 p. m. the defendant called his wife from the tavern he operated and told her the "woman" wanted to see him once more

and she would then leave him alone.[1] Mrs. Silvas asked the defendant if he had been drinking and he admitted he had been. She thereupon told him if he didn't feel good he should close the bar early and come home which he did. After arriving home, defendant quarreled with his wife over whether he should go see this other woman. Shortly after 11 p. m. defendant left the house with a gun. He was later seen in the New Deal Bar and the Wonder Bar in Casa Grande.

At approximately 1 a. m. Mrs. Mankel's mother, Angelita Olmos, heard someone at the front door of the Mankel house. She aroused her daughter who went to the door. Mrs. Olmos heard an argument lasting approximately fifteen or twenty minutes between her daughter and a man, whom she identified by voice as the defendant. Upon hearing six shots from a gun she rushed from her bedroom and ran outside, thinking they had come from outside the home. She then returned to the living room where she found her daughter slumped on the couch bleeding profusely.

Her daughter was alive but expired shortly thereafter.

The defendant surrendered himself at the Casa Grande Police Department at approximately 5 a. m. He had with him a .38 caliber revolver containing six fired shells. A full statement was taken from him wherein he admitted shooting the decedent at her home.

■ Defendant made six assignments of error which will be considered in the order made. His first assignment is that the trial court erred in refusing to grant defendant's motion for a directed verdict. He contends that he was entitled to a directed verdict of not guilty since there was no evidence that the bullet wounds allegedly inflicted by defendant 'caused decedent's death.

The doctor[2] who performed the autopsy on decedent testified that there were seventeen wounds in decedent's body.[3] Defendant therefore asserts the proposition that since there was an odd number of holes in the decedent's body and no bullet remained in her body[4] at least one wound

1. Defendant contended he had endeavored to break off the illicit romance although there is no direct evidence of such in the record.
2. Dr. Roland F. Schoen was asked by the Casa Grande Police Department to do a post mortem upon the body of Mrs. Mankel.
3. The evidence is not entirely clear as to the exact number of shots fired. Mrs. Olmos testified that there were six shots.

Mr. Mankel (who was asleep in another bedroom at the time of the shooting) testified that he heard only four shots. Five bullets were found at the Mankel residence by the police. When the defendant surrendered his gun to the police officers it contained six empty shells.
4. Dr. Schoen testified that the body of decedent was x-rayed and that no bullets were found therein.

was not a bullet wound for "it is the simple physical law that a bullet which passes through a human body * * * must leave an even number of holes." He argues that since there is no evidence that any one wound or any combination of wounds caused or would have caused death, and one wound couldn't have been caused by a bullet, it is possible decedent died solely from the "mystery wound." [5] He contends that in view of the circumstances surrounding the decedent's death (an adulterous wife entertaining her paramour in the darkened living room of the home wherein her mother and husband were) that someone, in a frenzy of anger, may have administered the "mystery wound" which at least contributed to and perhaps may have caused the death of the decedent.

Although it is apparent from examining the testimony of the witnesses that there is some conflict surrounding the events on the night of the shooting [6] it is not disputed that defendant called upon the decedent and that he fired the shots. There is no intimation anywhere throughout the record that anyone else had anything to do with the shooting other than the defendant. Nor is there any evidence that the decedent died by other than "multiple gunshot wounds." [7]

■ Rule 270 of the Arizona Rules of Criminal Procedure, 17 A.R.S., provides that "if * * * the court is of the opinion that the evidence is insufficient to warrant a conviction, it may, and on the motion of the defendant shall, direct the jury to acquit the defendant." However, there

5. There was no evidence of any other weapon other than a pair of scissors lying on the couch. However, there was nothing in the record linking the scissors with decedent's death.

6. Mrs. Olmos testified that she was lying awake and heard a knock about 1 a. m. (February 12, 1959); that she aroused the decedent who went to open the door; that a conversation between decedent and the caller, whom she identified as the accused, ensued for fifteen or twenty minutes; that she heard two shots fired and then four others in quick succession; that she rushed from her bedroom and ran outside thinking that the shots came from outside the home; that she saw a green and white car in front of the house which she said remained there for fifteen or twenty minutes more; that she returned to the living room, turned on the lights, saw her daughter slumped on the couch bleeding badly, and then "hollered" for her son-in-law.

Decedent's husband, who was sleeping in another room, testified that his wife woke him up saying the police department was calling for him (Mr. Mankel worked for the State Highway Department and was in the habit of being called out in emergencies); that after his wife left the room to answer the door he went back to sleep; that he was again awakened by four shots; that he ran through a darkened living room and went outside; that he saw a car pulling out; that he went back into the living room and saw his wife bleeding to death. He stated he heard no argument.

7. Dr. Schoen testified "that the cause of death was multiple gunshot wounds." Defendant's counsel stipulated as to the doctor's qualifications, that he was a physician and surgeon and that he was qualified to conduct post mortems.

is no duty on the part of the court to direct an acquittal where there is substantial evidence that the defendant committed the crime of which he is accused. State v. Merryman, 79 Ariz. 73, 283 P.2d 239 (1955); State v. King, 66 Ariz. 42, 182 P.2d 915 (1947). In the case at bar the trial court felt the evidence was sufficiently strong to go to the jury. It did not err since there was substantial evidence that defendant committed the crime.

■ Defendant's second assignment of error is that the court erred in determining defendant was able to understand the proceedings and to assist in his defense. He contends that the requirements of Rule 250, Arizona Rules of Criminal Procedure, were not met.[8]

On the fifth day of the trial, counsel for defendant advised the court that he was having difficulty in communicating with his client. Under the provisions of Rule 250 the court directed that defendant be transferred to the Camelback Sanitarium for examination by two psychiatrists, doctors William B. McGrath and Otto L. Bendheim.[9] A hearing was then held pursuant to Rule 250. At the hearing Dr. McGrath testified that although defendant was suffering from an emotional disturbance called a "disassociative reaction" (a form of hysterical reaction to stress) he was able to understand the proceedings against him and to assist in his defense. According to the testimony of Dr. McGrath the question was not whether defendant was *able* to assist in his defense, but rather whether he was *willing* to so assist. He testified as follows:

"Q [By defendant's counsel] In other words, if I now ask him what he

8. Rule 250 provides:
   "A. If before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court shall immediately set a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party.
   "B. If the court, after the hearing, decides that the defendant is able to understand the proceedings and to assist in his defense it shall proceed with the trial.

If it decides that the defendant through insanity or mental deficiency is not able to understand the proceedings or to assist in his defense, it shall have the defendant committed to the institution authorized to receive him, * * *."

9. Prior to trial defendant's attorney filed a motion for a mental examination pursuant to Rule 250. Doctors McGrath and Bendheim were appointed to examine the defendant which they did. By stipulation of the parties the report of the doctors was received and filed with the court in lieu of the hearing provided for by Rule 250. Their conclusion at that time was:
   "This man is able to differentiate right from wrong and to adhere to the right. He is able to comprehend charges filed against him and to assist counsel in his defense."

proposes to testify to in this case when he takes the witness stand and he refers me to the Bible in response thereto, would you not say he was to that extent unable to assist his counsel in this case?

"A No.

"Q You feel that he would be assisting me?

"A No, that wasn't the question. Whether he was able.

"Q That he was able?

"A He might not assist you, but that does not necessarily imply that he was unable to assist you.

\*    \*    \*    \*    \*    \*

"Q And can you explain to me the phenomena of that occurring?

"A Well, point 1, I do not feel that his referring you to the Bible is a symptom of a mental illness.

"Q Yes.

"A Point 2, I believe he has a choice. It is within his capacity to make the choice whether to answer your question relevantly or to refer you to the Bible.

"Q I see.

"A Third, if he refers you to the Bible I think it is because he is unwilling to answer your question in any other context or way, not unable.

"Q But unwilling?

"A Yes.

"Q And is the unwillingness something that he can control?

"A Yes."

Dr. Bendheim testified that at times defendant was "temporarily out of touch with reality." However, Dr. Bendheim was of the opinion defendant was able to understand the proceedings and to assist in his defense. He testified in answer to a question put by the court:

"The Court: Your answer to a situation in law is that he is not insane or mentally defected to the point he is not able to understand or comprehend the nature of the proceedings against him or assist in his defense?

"A That is correct. I am convinced in my own mind that the defendant is able to assist counsel in his defense."

At the conclusion of the hearing the court stated it was satisfied defendant was able to assist counsel in his defense.

■ Where a court has ordered a hearing conducted as to a defendant's mental condition, the trial court's decision as to whether such defendant is able to stand trial will be upheld unless there is a manifest abuse of discretion. State v. Reid, 87 Ariz. 123, 348 P.2d 731 (1960). In the instant case there was no manifest abuse of discretion.

The third assignment is that the trial court erred in denying defendant's motion for a new trial upon the ground of misconduct and improper argument of the county attorney. Defendant contends that the county attorney, in his closing argument, improperly argued from facts not in evidence and "testified" by stating his own knowledge of the facts.

■ We have searched the record and find no objection lodged either at the time the complained of statements were made or at the completion of the final argument. It has long been the rule of this Court that if improper statements are made by counsel during the trial it is the duty of opposing counsel to register an objection thereto so that the court may make a correction by proper instruction. State v. Evans, 88 Ariz. 364, 356 P.2d 1106 (1960); State v. Boozer, 80 Ariz. 8, 291 P.2d 786 (1955); Sullivan v. State, 47 Ariz. 224, 55 P.2d 312 (1936). The defendant's failure to object to the argument of counsel for the state constituted a waiver of the right to have it reviewed.

■ Defendant's next assignment is that the trial court erred in denying defendant's motion for a new trial upon the ground of incapacity of a juror and misconduct of the jury. He contends that Betty Jo Hobbs, a juror, was mentally incompetent to perform her duties intelligently, and since this fact was not known to the parties or the court during the trial a new trial must be awarded. In support of such contention defendant points out that less than two hours after the trial was concluded, Mrs. Hobbs was found in a catatonic state in her automobile on the streets of Superior and that she remembered nothing that occurred after the jurors returned from their evening meal on the last day of the trial. At the hearing on the motion for new trial Dr. Howard W. Finke [10] testified that he diagnosed her condition as a form of hysteria— "a conversion reaction". Dr. Finke stated that this was a normal reaction which any normal person might experience when under a period of stress for some time.[11] He was unable to state exactly when such reaction affected Mrs. Hobbs. However, other jurors testified that there was absolutely no evidence of incapacity upon the part of Mrs. Hobbs either during the trial or during their deliberations. After hearing the evidence, the court decided that Mrs. Hobbs was not disqualified. It does not appear from an examination of the record that the court abused its discretion in such decision. Johnson v. State, 33 Ariz. 354, 264 P. 1083 (1928).

Defendant also contends there was misconduct of the jury inasmuch as pressure

---

10. Dr. Finke was Mrs. Hobb's personal physician and was called to her car at the time she was found in the catatonic state.

11. The trial lasted for nine days.

had been exerted upon Mrs. Hobbs by the other jurors during their deliberations. Mrs. Hobbs stated in an affidavit that it was her opinion that the defendant was legally insane at the time of the alleged crime and would have so voted had it not been for the pressure exerted upon her by the other jurors. However, the record shows that the jury was polled at the request of the defendant and that when Mrs. Hobbs was asked if that was here verdict she replied "Yes".

■ The law is well settled in this state that the verdict of the jury in a criminal case may not be impeached by the affidavit of a juror who has, in open court, solemnly agreed to the verdict. State v. Murphy, 79 Ariz. 161, 285 P.2d 614 (1955); State v. Pollock, 57 Ariz. 415, 114 P.2d 249 (1941); Johnson v. State, supra.

■ On a motion for new trial the trial court conducted a full and complete investigation into the matter and after hearing all of the evidence, rendered its decision denying the motion. We hold it did not err.

Defendant's last assignment of error is that the court erred in denying defendant's motion for a new trial upon the ground that the verdict was contrary to the weight of the evidence. He contends that the evidence was not sufficient to satisfy the jury of defendant's guilt beyond a reasonable doubt.

■ In reviewing the sufficiency of the evidence to support a conviction we have on many occasions stated the rule to be that the evidence is to be viewed in the light most favorable to the state, and all reasonable inferences therefrom must be taken in the most unfavorable manner to the defendant. State v. Hilliard, 89 Ariz. 129, 359 P.2d 66 (1961); State v. Evans, 88 Ariz. 364, 356 P.2d 1106 (1960); State v. Milton, 85 Ariz. 69, 331 P.2d 846 (1958); State v. Stephens, 66 Ariz. 219, 186 P.2d 346 (1947). This Court has stated that "we will not substitute our judgment for that of the jury where the verdict finds substantial support in the evidence." State v. Evans, supra. We hold that the evidence was sufficient to sustain the conviction.

The judgment is affirmed.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concurring.